Leslie Fox, Ardelle Malone, Doris E. Young, Lorna L. Jackson, Rose Coleman, Virginia Cooper, Marlene Cross, Linda Cunningham and Linda Porter, Petitioners-Respondents,

Norman O. SAUEY and Carla M. Sauey, and The Portage Area Association for Progress, Intervenors-Respondents,

v.

Wisconsin DEPARTMENT OF HEALTH & SOCIAL SERVICES, Appellant.

E. Michael MCCANN, Petitioner-Respondent,

Norman O. SAUEY and Carla M. Sauey, and The Portage Area Association for Progress, Intervenors-Respondents,

v.

Wisconsin DEPARTMENT OF HEALTH & SOCIAL SERVICES, Appellant.

Supreme Court

*No. 82–1594. Argued April 12, 1983.—Decided June 1, 1983.*

(Also reported in 334 N.W.2d 532.)

For the appellant the cause was argued by *Robert W. Larsen,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

For the respondents there was a joint brief by *Kevin J. Lyons, Renee Martin* and *Cook & Franke, S.C.,* and oral argument by *Mr. Lyons* for The Portage Area Association for Progress; *E. Michael McCann,* district attorney, and *Brian B. Burke,* assistant district attorney, and oral argument by *Mr. McCann; R. Jeffrey Krill*

and *Michael, Best & Friedrich,* and oral argument by *Mr. Krill* for Norman and Carla Sauey; *Thomas G. Halloran* for Leslie Fox, et al. all of Milwaukee.

DAY, J. This is an appeal from a memorandum decision[1] of the circuit court for Milwaukee county, Hon. Patrick T. Sheedy, Judge, entered on August 4, 1982. The trial court, in a review of a ch. 227 proceeding conducted by the Department of Health and Social Services (DHSS) determined that a Final Environmental Impact Statement (FEIS) which had been prepared for a proposed maximum security prison in Portage failed to comply with the statutory requirements found in the Wisconsin Environmental Policy Act (WEPA).[2] The trial

---

[1] A memorandum decision of a trial court is appealable if it constitutes an order or judgment that is, a final ruling of the court. *Fredrick v. City of Janesville,* 92 Wis. 2d 685, 688, 285 N.W.2d 655 (1979). The court of appeals in an order dated September 20, 1982 determined that the memorandum decision in this case was appealable. That order is not challenged by any of the parties here. Further, we note that a circuit court order remanding a case to an administrative agency is appealable as of right under sec. 808.03(1), Stats. *Bearns v. ILHR Dept.,* 102 Wis. 2d 70, 306 N.W.2d 22 (1981).

[2] Section 1.11, Stats. 1979–80:

"**1.11 Governmental consideration of environmental impact.** The legislature authorizes and directs that, to the fullest extent possible:

"(1) The policies and regulations shall be interpreted and administered in accordance with the policies set forth in this section and chapter 274, laws of 1971, section 1; and

"(2) Except as provided in s. 145.022, all agencies of the state shall:

"(c) Include in every recommendation or report on proposals for legislation and other major actions significantly affecting the quality of the human environment, a detailed statement, substantially following the guidelines issued by the United States council on environmental quality under P.L. 91–190, 42 U.S.C. 4331, by the responsible official on:

"1. The environmental impact of the proposed action;

"2. Any adverse environmental effects which cannot be avoided should the proposal be implemented;

court remanded the case to DHSS with directions to prepare a statement in compliance with that statute. The trial court also issued an injunction which prohibited further work on the prison until such time as the statutory mandates of WEPA were met.

DHSS appealed. On December 2, 1982, a petition to bypass the court of appeals was filed. This court granted the petition on December 27, 1982, and on January 19, 1983, granted a motion for temporary relief pending

"3. Alternatives to the proposed action;

"4. The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

"5. Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented;

"6. Such statement shall also contain details of the beneficial aspects of the proposed project, both short term and long term, and the economic advantages and disadvantages of the proposal.

"(d) Prior to making any detailed statement, the responsible official shall consult with and obtain the comments of any agency which has jurisdiction or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate agencies, which are authorized to develop and enforce environmental standards shall be made available to the governor, the department of natural resources and to the public. Every proposal other than for legislation shall receive a public hearing before a final decision is made. Holding a public hearing as required by another statute fulfills this section. If no public hearing is otherwise required, the responsible agency shall hold the hearing in the area affected. Notice of the hearing shall be given by publishing a class 1 notice, under ch. 985, at least 15 days prior to the hearing in a newspaper covering the affected area. If the proposal has state-wide significance, notice shall be published in the official state newspaper;

"(e) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

"(h) Initiate and utilize ecological information in the planning and development of resource-oriented projects."

appeal to allow DHSS to engage in planning activities for the project.

The issues considered on appeal are:[3]

1. Did the petitioners (McCann, Fox, et al.) have standing to bring an action seeking review of the administrative decision determining the FEIS to be adequate?

2. If not, can the intervenors (Sauey, et al.) continue to press their claims even though the petitioners have been dismissed from the action?

We conclude that the petitioners lacked standing to seek review of the administrative decision. We also conclude that the intervenors may not continue to press their claims once the original petitioners have been dismissed for lack of standing.

Accordingly, we reverse the decision and order of the trial court and direct the court to dismiss the petitions for review.

Prison overcrowding has been a problem in this state since the mid-1970's. In July, 1976, DHSS requested the State Building Commission (SBC) to release funds for the preparation of a study on the problem. The funds were authorized in September, 1976. Flad and Associates, Inc. was commissioned to develop a Six Year Master Plan (hereinafter Flad Report) addressing the state's correctional needs through 1985. The report was a comprehensive planning document which included: a

---

[3] In addition to the issues considered here, other issues were raised on appeal. These issues included: 1) Whether the circuit court erred in finding the FEIS inadequate and 2) Whether the due process rights of the parties to the administrative hearing were violated by the manner in which the administrative hearing on the adequacy of the FEIS was conducted.

Because we conclude that the petitioners lacked standing to seek review of this administrative decision and also conclude that the intervenors may not continue to press their claims, we do not reach either of these questions.

description of the existing correctional system, projections of the future inmate populations, alternatives to the present system (including a "do nothing" alternative) and recommendations on policy changes, facility improvements and additions and legislative changes. Included in the recommendations was the construction of two maximum security institutions in the southeastern part of the state.

Thirty-nine sites, all government owned property, were initially identified as potential locations for prison facilities. Many of these sites were deemed to be unsuitable and the list was reduced to ten sites.

In March, 1979, the firm of Howard Needles Tammen and Bergendoff (HNTB) was hired to prepare an environmental impact statement on those ten sites. The preliminary environmental impact report on these sites (hereinafter ten site-PER) was completed in July, 1979. Hearings on this report were held. However, because of substantial local opposition to each of the sites, in October, 1979, Governor Dreyfus announced that none of the sites would be considered any further as a prison location. He then invited communities interested in being considered as a location for the prison to submit applications to his office.

Ten communities expressed an interest in the prison. The proffered locations were reviewed by an ad hoc committee established by the governor. This committee recommended sites in Portage, Milwaukee, and the town of Caledonia in Racine county. The governor eliminated the Milwaukee area from further consideration. After voters in a referendum in the town of Caledonia rejected locating a prison in their community, he announced in January, 1980 that the new prison would be built in Portage.

In April, 1980, the legislature directed DHSS to construct a new prison.[4] Although the legislation specified

---

[4] Chapter 332, sec. 353, Laws of 1979.

that the prison be built on one of three sites in the Milwaukee area, that language was vetoed by the governor.

On May 27, 1980, the SBC voted to spend $700,000 to prepare plans for a maximum-medium security prison in the Portage area. The legislature's Joint Committee on Finance voted to release funds for the project but the Portage site was not mentioned in the funding resolution.

On May 28, 1980, HNTB was hired to prepare an environmental impact statement on two potential sites in the Portage area. The study was to include an examination of the "do nothing" alternative.

HNTB completed a Preliminary Environmental Report (Portage PER) on the Portage sites in October, 1980. After soliciting and receiving comments on that report, the Final Environmental Impact Statement (FEIS) was prepared. It was published in February, 1981. A public hearing on the FEIS was held in Portage on March 30, 1981. In May, 1981, HNTB completed a Supplemental Sulfur Dioxide Air Quality Report that was made part of the FEIS.

On March 27, 1981, DHSS received a request for a contested case hearing under sec. 227.064(1), Stats.[5] challenging the sufficiency of the FEIS. Those requesting the hearing included the Hon. E. Michael McCann, Milwaukee County District Attorney, Ms. Leslie Fox and

---

[5] Section 227.064(1), Stats. 1979–80:

"227.064 **Right to hearing.** (1) In addition to any other right provided by law, any person filing a written request with an agency for hearing shall have the right to a hearing which shall be treated as a contested case if:

"(a) A substantial interest of the person is injured in fact or threatened with injury by agency action or inaction;

"(b) There is no evidence of legislative intent that the interest is not to be protected;

"(c) The injury to the person requesting a hearing is different in kind or degree from injury to the general public caused by the agency action or inaction; and

"(d) There is a dispute of material fact."

others (hereinafter collectively referred to as Fox, et al.), relatives of individuals who were at the time incarcerated in the Wisconsin prison system, and the Portage Area Association for Progress (hereinafter PAAP). DHSS granted the request and hearings were held in June and July, 1981.

Those hearings were conducted before Robert Kletzien, a DHSS hearing examiner, and Eric Stanchfield, executive assistant to DHSS Secretary, Donald Percy. In a memorandum dated May 21, 1981 and made part of the hearing record on May 26, 1981, Mr. Percy delegated to Mr. Stanchfield the authority to make the final decision for DHSS on the adequacy of the FEIS.

On December 18, 1981, Stanchfield issued his decision which concluded that the FEIS met the requirements set out in WEPA. He therefore ordered that the petitions challenging the sufficiency of the FEIS be dismissed. On January 20, 1980, Percy filed a Record of Decision[6] in which the actual site for the prison was chosen.

The petitioners sought judicial review of these decisions.[7] On February 8, 1982, twenty-four days after the first petition to review the administrative decision was filed and fifty-two days after Stanchfield's decision, Norman and Carla Sauey filed a petition to intervene in the case. PAAP filed a notice of participation in both lawsuits challenging Stanchfield's decision on February 10, 1982.

On August 4, 1982, Judge Sheedy issued a memorandum decision in which he determined that the FEIS did

---

[6] For a statement as to the purpose of the Record of Decision see 40 CFR 1505.2 (1982).

[7] Four suits were initially filed in this case. McCann and Fox, et al., each filed petitions on January 18, 1982, and January 15, 1982, respectfully, seeking judicial review of Stanchfield's decision and each sought review of Percy's decision in petitions filed February, 1982. These cases were consolidated by an order dated April 5, 1982.

not meet the requirements in WEPA. Specifically, the trial judge found that the FEIS lacked the following: a sufficient alternatives section, a sufficient archeological study and an adequate water quality and air quality analysis. The court also determined that the due process rights of the parties to the administrative hearing were violated by DHSS's conduct of the administrative hearing process. The court remanded the case to DHSS with directions to prepare a FEIS that complied with the statutory requirements.

The first issue on appeal is whether the petitioners have standing to bring an action seeking review of the administrative decision determining the FEIS to be adequate. The standing of the petitioners is challenged by DHSS.

Standing to seek review of an administrative decision is governed by secs. 227.15[8] and 227.16(1),[9] Stats. 1979-

[8] Section 227.15, Stats. 1979-80:

"227.15 **Judicial review; orders reviewable.** Administrative decisions which adversely affect the substantial interests of any person, whether by action or inaction, whether affirmative or negative in form, except the decisions of the department of revenue, the commissioner of banking, the commissioner of credit unions, the commissioner of savings and loan, and the state board of vocational, technical and adult education acting under s. 38.29, and as otherwise provided by law, shall be subject to judicial review as provided in this chapter."

[9] Section 227.16(1), Stats. 1979-80:

"227.16 **Parties and proceedings for review.** (1) Except as otherwise specifically provided by law, any person aggrieved by a decision specified in s. 227.15 shall be entitled to judicial review thereof as provided in this chapter."

"(a) Proceedings for review shall be instituted by serving a petition therefor personally or by certified mail upon the agency or one of its officials, and filing the petition in the office of the clerk of the circuit court for the county where the judicial review proceedings are to be held. Unless a rehearing is requested under s. 227.12, petitions for review under this paragraph shall be served and filed within 30 days after the service of the

80. *Wisconsin's Environmental Decade, Inc. v. PSC.*, 69 Wis. 2d 1, 9, 230 N.W.2d 243 (1975) (hereinafter *WED I*). Both sections require a petitioner to "show a direct effect on his legally protected interests." 69 Wis. 2d at 9.

This court has established a two-part analysis, similar to the federal test, for determining whether parties seeking to challenge an administrative rule have standing. 69 Wis. 2d at 10. The first step is to determine "whether the decision of the agency directly causes injury to the interest of the petitioner. The second step is to determine whether the interest asserted is recognized by law." 69 Wis. 2d at 10. The first step has been compared to the federal test: Does the challenged action cause the petitioner injury in fact? 69 Wis. 2d at 10; *St. ex rel. 1st Nat. Bank v. M & I Peoples Bank,* 95 Wis. 2d 303, 308–309, 290 N.W.2d 321 (1980); *Bench v. Milwaukee,* 107 Wis. 2d 469, 479, 320 N.W.2d 199 (1982).

This court has frequently held that the law of standing in Wisconsin should not be construed narrowly or restrictively. *WED I,* 69 Wis. 2d at 13; *Bence,* 107 Wis. 2d at 478; *City of Madison v. Fitchburg,* 112 Wis. 2d 224, at 230, 332 N.W.2d 782 (1983). Where an actual injury is demonstrated, even a "trifling interest" may be sufficient to confer standing. *Madison,* 112 Wis. 2d. at 230; *1st Nat. Bank,* 95 Wis. 2d at 309. To have standing, the petitioner must have "suffered 'some threatened or actual

decision of the agency upon all parties under s. 227.11. If a rehearing is requested under s. 227.12, any party desiring judicial review shall serve and file a petition for review within 30 days after service of the order finally disposing of the application for rehearing, or within 30 days after the final disposition by operation of law of any such application for rehearing. The 30-day period for serving and filing a petition under this paragraph commences on the day after personal service or mailing of the decision by the agency. . . ."

injury resulting from the putatively illegal action' . . ." *1st Nat. Bank,* 95 Wis. 2d at 308, citing *Warth v. Seldin,* 422 U.S. 490, 499 (1975), quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 (1973). Although the magnitude of the injury is not determinative of standing, the fact of injury is. *1st Nat. Bank,* 95 Wis. 2d at 309.

The actual injury requirement was recently explained by the United States Supreme Court in *Los Angeles v. Lyons,* —— U.S. ——, 51 U.S.L.W. 4424 (1983).[10] In *Lyons,* the Court wrote that "Abstract injury is not enough. The plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.' " Slip opinion at 5–6 (cites omitted).

Although an abstract injury is not enough to confer standing on a party, the injury need not be a physical or economic one. In *WED I,* this court noted that in the area of environmental law, "An allegation of injury in fact to aesthetic, conservational and recreational interests has been readily accepted to confer standing." 69 Wis. 2d at 10. However, it should be noted that such injuries must be caused by a change in the physical environment before they would fall within the interests protected by the environmental protection act.[11] *See Metropolitan Edison v.*

---

[10] *See 1st Nat. Bank,* 95 Wis. 2d at 308, fn 5 for an explanation of this court's reliance upon federal case law on standing matters.

[11] WEPA does not create a public trust in the environment. *WED I,* 69 Wis. 2d at 18. In order to question an agency's compliance with the statute, it must be shown that "the person alleging injury resides in the area most likely to be affected by the agency action in question [and] . . . that the agency's action will harm the environment in the area where the person resides." 69 Wis. 2d at 18–19.

*People Against Nuclear Energy,* —— U.S. ——, 51 U.S. L.W. 5371 (1983), slip opinion at 6–7.

Standing to challenge the administrative decision is not conferred upon a petitioner merely because that person requested and was granted an administrative hearing. *Cornwell Personnel Associates v. ILHR Dept.,* 92 Wis. 2d 53, 63, 284 N.W.2d 706 (Ct. App. 1979); *Milwaukee v. Public Service Comm.,* 11 Wis. 2d 111, 104 N.W.2d 167 (1960). Therefore, the tests set out above must be met or a petitioner's claim must be dismissed for lack of standing.

In reviewing the extensive record in this case, we conclude that none of the petitioners have alleged or proven sufficient injury in fact so that they would have standing to challenge the administrative decision finding the FEIS adequate.

In order to have standing to challenge Stanchfield's decision that the FEIS was adequate, McCann must allege or prove that 1) he has been directly injured by the decision or that there is a real and immediate threat of direct injury and 2) that the injury is to a legally protected interest.

In support of his claim of injury as the result of Stanchfield's decision, McCann claims that he has "unique criminal, social, economic and environmental interests" which have been injured by the failure of DHSS to "rigorously explore" the alternative of placing a prison in Milwaukee county.

Specifically, McCann hypothesizes that placing a prison in Portage will disrupt the lives of inmates from Milwaukee in the institution because they will be farther away from their families making visitation more difficult. He claims this will lead to an increase in the rate of recidivism. He says that approximately one-half of the inmates in the correctional system are from Milwaukee county, and that an increase in the recidivism rate will

increase the crime rate in Milwaukee county. He says this will injure him in his official capacity as the Milwaukee County District Attorney. McCann also argues that the disruption in inmates' lives which will result from being placed in a prison that is not near their home will ultimately cause a disintegration of the prisoners' families. This he concludes will lead to an increase in welfare costs which will injure him in his official capacity. What specific injury will result is not specified. Finally, McCann suggests that if the prison is built in Portage, substantial tax dollars from within the district attorney's budget will be required to transport prisoners, witnesses and investigators to and from the prison. This claim of transportation costs could be made by any district attorney outside the county where the prison is built since all prisoners must be transported at county expense to some prison. We do not see this as an "injury" under WEPA.

Reviewing these claims of injury, we conclude that none of them are sufficiently direct so as to support a claim of standing for McCann.

All of McCann's alleged injuries arise only from presumed psychological effects that inmates in the prison system from Milwaukee will experience if they are placed in a prison in Portage. As such, they are simply too remote to be considered "direct injury" so as to confer standing on McCann.

This Court in *WED I* stated, that an "Injury alleged, which is remote in time or which will only occur as an end result of a sequence of events set in motion by the agency action challenged, can be a sufficiently direct result of the agency's decision to serve as a basis for standing." 69 Wis. 2d at 14. However, the sequence of events cannot be so "conjectural or hypothetical," *Lyons,* slip opinion at 6, as to strain the imagination. In a suit

brought to challenge the adequacy of an FEIS, the injuries claimed must show a direct causal relationship to a proposed change in the physical environment. The United States Supreme Court recently held that the National Environmental Policy Act (NEPA), should "be read to include a requirement of a reasonably close causal relationship between a change in the physical environment and the effect at issue." *Metropolitan Edison,* slip opinion at 7. The same reasoning holds true in interpreting WEPA which was patterned after the Federal Act.

In *Metropolitan Edison,* the Court considered the question of whether psychological health damage caused by the risk of a nuclear accident was cognizable under NEPA so as to require the Nuclear Regulatory Commission (NRC) to consider the psychological effects of its action in an environmental impact statement done in regard to resuming the operation of Three Mile Island Unit 1 (TMI–1) nuclear power plant. The Court concluded that such effects were not cognizable under NEPA and stated that "this harm is simply too remote from the physical environment to justify requiring the NRC to evaluate the psychological health damage to these people that may be caused by renewed operation of TMI–1." Slip opinion at 7. The Court further noted that,

"If contentions of psychological health damage caused by risk were cognizable under NEPA, agencies would, at the very least, be obliged to expend considerable resources developing psychiatric expertise that is not otherwise relevant to their congressionally assigned functions. The available resources may be spread so thin that agencies are unable adequately to pursue protection of the physical environment and natural resources. As we said in another context in *United States v. Dow,* 357 U.S. 17, 25 (1958), '[w]e cannot attribute to Congress the intention to . . . open the door to such obvious incongruities and undesireable [sic] possibilities.' " Slip opinion at 9.

McCann's claims of injury are even further removed from the environment than were the claims of psychologi-

cal injury in *Metropolitan Edison*. In *Metropolitan Edison*, it was the petitioners who were claiming psychological health damage. Here, McCann claims no such damage to himself. Rather, his claims all begin on the assumption that placing a prison in Portage will have a negative psychological effect on the prisoners there. That effect will in turn cause a higher rate of recidivism which will in turn increase the crime rate and welfare costs in Milwaukee county. It is those increases which McCann postulates will injure him in his official capacity as a district attorney.

McCann's claims of injury are simply too indirect and speculative to confer standing on him to challenge Stanchfield's decision. Further, the claims of injury do not bear a close causal connection to a change in the physical environment.

Standing must ultimately rest on a showing, or at least an allegation, of direct injury or a real and immediate threat of direct injury. None of McCann's claims reach this level. He has not alleged or demonstrated any causal relationship between his "injuries" and a change in the physical environment. His claimed injuries will result only if a sequence of increasingly unlikely events actually occur. Under these conditions, we cannot conclude that McCann has or will suffer an injury sufficient to confer standing on him to bring this action.

Even if this court was to determine that the injuries McCann claims were sufficiently direct to form a basis for standing, we would nonetheless conclude that McCann lacked standing here. For standing to exist, two things must be shown. First, there must be some direct injury or a threat of direct injury. Second, the injury must be to a legally protected interest. In addition to concluding McCann has failed to show a direct injury, we also conclude that any injury he claims is not to a legally protected interest.

McCann's claim of injury is based upon conjecture as to how inmates at a prison in Portage will psychologically react to being placed there. In *Metropolitan Edison,* the risk of a nuclear accident and the attendant psychological reactions to such a risk were not cognizable under NEPA because they were too remote from the physical environment. Slip opinion at 7. Similarly, McCann's injuries are not causally related to the physical environment. Instead, they flow from the psychological effect on inmates of placing a prison in Portage. While it is true the effects on psychological health can be cognizable under NEPA, *Metropolitan Edison,* slip opinion at 4, the effects must be related to a change in the physical environment. Here, McCann's injuries flow from the psychological effects and not from the physical environment. As such they are not injuries to interests protected by WEPA.[12]

---

[12] McCann's claims are very similar to the following two hypotheticals set out by Justice Rehnquist in *Metropolitan Edison:*

"If the Department of Health and Human Services were to implement extremely stringent requirements for hospitals and nursing homes receiving federal funds, many perfectly adequate hospitals and homes might be forced out of existence. The remaining facilities might be so limited or so expensive that many ill people would be unable to afford medical care and would suffer severe health damage. Nonetheless, NEPA would not require the Department to prepare an EIS evaluating that health damage because it would not be proximately related to a change in the physical environment.

"Some effects that are 'caused by' a change in the physical environment in the sense of 'but for' causation, will nonetheless not fall with [NEPA] because the causal chain is too attenuated. For example, residents of the Harrisburg area have relatives in other parts of the country. Renewed operation of TMI–1 may well cause psychological health problems for these people. They may suffer 'anxiety, tension and fear, a sense of helplessness, and accompanying physical disorders, . . . because of the risk that their relatives may be harmed in a nuclear accident. However, this harm is simply too remote from the physical environment to justify requiring the NRC to evaluate the psycholog-

This court has also recognized that there must be some substantial and direct causal link between the injury claimed and the physical environment before the injury will be to a legally protected interest. In *WED I*, this court noted that WEPA does not create a public trust in the environment such that any citizen of this State may bring suit to question compliance with its provisions. 69 Wis. 2d at 19. This court determined that "the legislature intended [WEPA] to recognize the rights of citizens to be free from the harmful effects of a damaged environment where it can be shown that the person alleging the injury *resides in the area most likely to be affected* by the agency action in question . . . [and] . . . where the agency's action will *harm the environment where the person resides." WED I,* 69 Wis. 2d at 18–19. (Emphasis added.)

These requirements are clearly designed to limit the class of people who may bring an action to question an agency's compliance with WEPA. The legislature in WEPA established the rights of citizens to have the effects on the physical environment of certain state actions examined and published before such action is taken. To that end, it recognized that citizens residing in the area most likely to be affected by an agency action have a legally protected interest in the quality of their environment. However, the legislature did not intend WEPA to create a forum for the airing of political disputes.

The United States Supreme Court recently recognized that NEPA was not "intended to give citizens a general opportunity to air their policy objections to proposed federal actions. The political process, and not NEPA, provides the appropriate forum in which to air policy dis-

ical health damage to these people that may be caused by renewed operation of TMI-1." Slip opinion at 7.

In both, as is the case here, the causal claim lacks the crucial first element—a direct link to some change in the physical environment.

agreements." *Metropolitan Edison,* slip opinion at 10. We find this conclusion equally applicable to WEPA. Policy disputes are more properly resolved in the political arena than in environmental litigation.

We determine that petitioner McGann, who does not reside in the Portage area, has failed to allege or show any injury or threat of injury arising from Stanchfield's decision that the FEIS was adequate. He is not a person aggrieved within the meaning of the statutes governing judicial review of administrative decisions. He does not have standing to seek review of Stanchfield's decision and therefore must be dismissed from this action.[13]

Petitioners Fox, et al., have relatives who are currently incarcerated in the Wisconsin prison system and their claim of standing is based upon an assumption that some of their relatives may be transferred to a new prison in Portage.

Fox, et al., argue that if such a transfer occurs, their family lives will be adversely affected in several significant ways. The ways are not specified however and this court is apparently left to speculate on the injuries which may result if one of the families' relatives ends up being transferred to the new prison in Portage.

For Fox, et al., to have standing to challenge Stanchfield's decision, they must show a real and immediate threat of direct injury. The direct injury requirement has two components. First, the injury must not be so far removed from the cause as to be merely hypothetical or conjectural. *Lyons,* slip opinion at 6. Second, there must be a "reasonably close causal relationship between a change in the physical environment and the effect at issue." *Metropolitan Edison,* slip opinion at 7.

---

[13] Because we find that McCann lacks standing, we do not reach the issue raised by DHSS concerning his legal authority as a District Attorney to initiate this proceeding for judicial review.

Fox, et al.'s, claims meet neither of these requirements. They do not and in fact cannot allege that any of their relatives will actually be incarcerated in the prison in Portage. Even if such an allegation could be made and supported, the effect on Fox, et al.'s, family lives of having their relatives incarcerated in Portage versus another facility in the correctional system is at best speculative and uncertain. Even they have not been able to articulate the kinds of injuries that will occur if their relatives are incarcerated at Portage. Further, the kind of injury which appears to be claimed here—disruption of the prisoners' relatives' family lives—does not have a close causal relationship to a change in the physical environment in Portage. Nothing about building the prison in Portage will cause injury to Fox, et al.

Just as McCann's claims of injury flow from an assumption that incarceration in a prison in Portage will have a negative psychological effect upon the inmates there, so too are Fox, et al.'s, claims. And, just as McCann's injuries were too remote from any change in the physical environment to confer standing, so too are Fox, et al.'s. To the extent their claims have arguable validity, they should be addressed in the forum that considers those arguments. They are not environmental injuries so as to fall within the intended scope of WEPA.

Even if it could be said that Fox, et al., had established a direct injury so as to satisfy the first step of the standing analysis, we would nonetheless conclude that the injuries asserted are not to a legally protected interest.

As set out above, WEPA establishes a legally protected interest in the environment in the area likely to be affected by the agency action. That area surrounds Portage. Fox, et al., are from Milwaukee and any injuries claimed to the environment in Milwaukee would not be to an interest recognized by WEPA unless those injuries had a close causal relationship to a change in the physical environment in Portage. No such link has been established.

We would also note that no other statute or constitutional provision would give Fox et al. a legally protected interest here. In *Olin v. Wakinekona,* ⸺ U.S. ⸺, 51 U.S.L.W. 4491 (1983), the United States Supreme Court determined that the State of Hawaii could transfer a prison inmate from a facility in Hawaii across the Pacific Ocean to a prison facility in California without violating the prisoner's due process rights. The Court noted that, "Just as an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State, he had no justifiable expectation he will be incarcerated in any particular State." Slip opinion at 7.

Just as an inmate has no legally protected interest in being placed in a prison near his home, we also conclude that neither does the prisoner's family have a protected interest in having their relative in a prison near their home. Certainly none is conferred by WEPA.

We conclude that Fox, et al., lack standing to challenge the administrative decision finding the FEIS adequate. Therefore respondent Fox, et al., must be dismissed from this suit for lack of standing.

The second issue on appeal is: Can the intervenors continue to press their claims even though the petitioners have been dismissed from the suit for lack of standing?

This question arises because the intervenors, Norman and Carla Sauey, and the Portage Area Association For Progress (PAAP), joined this action as intervenors rather than as petitioners. The Saueys are Portage area residents whose property is immediately adjacent to the site chosen for the new prison. PAAP is a group of Portage residents whose stated concerns are clean air, water and appropriate land use in Portage. It is clear that had the intervenors been petitioners, they would have had standing under WEPA to bring an action challenging Stanchfield's decision that the FEIS was ade-

quate. The question, however, is what happens to their claims now that the petitioners in this action have been dismissed.

The administrative decision being reviewed in this case was made on December 18, 1981.

The respondents imply that the decision being reviewed was made on January 20, 1982 by Percy. But such an argument is not supported by the record. The record shows that the decision on the adequacy of the FEIS was delegated to Eric Stanchfield by Percy. The parties were fully aware of this delegation. The delegation of this authority was extensively discussed during the course of the administrative hearings. There is no doubt from the record that the parties understood that Stanchfield would make the final decision on the adequacy of the FEIS. His decision was made on December 18, 1981.

The first petition to *review* Stanchfield's decision was filed on January 15, 1982 by Fox. A notice of participation in this suit was filed by PAAP on February 10, 1982 and a petition to *intervene* in that case was filed by the Saueys on February 8, 1982. On February 8, a petition to intervene was also filed by the Saueys in an action that had been started by McCann on January 18, 1982, to challenge Stanchfield's decision.

Under the statutes, a petition to review an administrative decision must be filed within thirty days of the day after the delivery or mailing of the decision. Sec. 227.16 (1) (a), Stats. The thirty day period commenced on December 19, 1981, and ended on January 18, 1982. No party filing later than January 18, 1982, could successfully seek review of the administrative decision. This court has held that unless the time requirements in sec. 227.16 (1) are strictly complied with, the subject matter jurisdiction of a trial court to review an administrative decision cannot be invoked. *Wis. Environmental Decade v. Public Service Comm.*, 84 Wis. 504, 512, 515, 267

N.W.2d 609 (1978), (hereinafter *WED II*). The earliest petition to intervene was filed twenty-one days *after* the time for filing petitions for review had expired. Even if the petition to intervene was treated as a petition for review, it would not meet the time requirements necessary to invoke the subject matter jurisdiction of the trial court.[14]

This court has not previously addressed the question of what happens to an intervenor's claim when the original petitioner has been dismissed. However, a number of federal courts have. We refer to them for guidance because the Wisconsin rule on intervention (sec. 803.09, Stats.) and the federal rule (FRCP 24) are essentially the same.[15]

The status of intervenors' claims after the dismissal of the original claim was set out in *Fuller v. Volk,* 351 F2d 323 (3rd Cir 1965). In *Fuller,* the court set forth the general rule that: "It is well-settled that since intervention contemplates an existing suit in a court of competent jurisdiction and because intervention is ancillary to the main cause of action, intervention will not be permitted to breathe life into a 'nonexistent' lawsuit." 351 F2d at 328.

There is an exception to the general rule but only where "it appears that the intervenor has a separate and inde-

---

[14] The petitioners (McCann and Fox, et al.) also filed suits challenging Percy's decision of January 20, 1982. Both suits were filed on February 19, 1982, and met the time requirements for petitions for review set out in sec. 227.16(1), Stats. PAAP filed a notice of participation in each suit on March 15, 1982, twenty-four days after the time for filing petitions for review had expired. The Saueys filed a motion to intervene in both suits on March 20, 1982, twenty-nine days late. Thus, even if it were Percy's decision that was being reviewed, the result here would not change.

[15] Harvey, *Rules of Civil Procedure,* sec. 3130 (West's Wisconsin Prac. Series (1975)).

pendent basis for *jurisdiction* and in which failure to adjudicate the claim will result only in unnecessary delay." (Emphasis added.) 351 F2d at 329. The purpose behind this exception is to "avoid the senseless delay and expense of a new suit, which at long last will merely bring the parties to the point where they are now." *Id.*

The rule set out in *Fuller* is widely followed. *McKay v. Heyison,* 614 F.2d 689 (3rd Cir. 1980). The only case that departs somewhat from the rule is *United States Steel v. EPA,* 614 F.2d 843 (3rd Cir. 1979). *USS* involved a petition for review of an administrative decision. The original petitioner had standing to bring the action and jurisdiction properly attached to the case when the petition for review was filed. In *USS,* the Court allowed an intervenor to continue with his claim even though the party who originated the action sought and obtained dismissal of his own claim. The intervenor in *USS* had filed a petition to intervene well after the time set for the filing of petitions for review. If the case had been dismissed, the intervenor could not have started anew because no separate and independent basis for jurisdiction would have existed. Nonetheless, the Court allowed the intervenor to continue the suit. In so holding however, the Court noted that the intervention was not curing a jurisdictional defect because jurisdiction had properly attached when the original petitioner filed the petition for review. The case only arose because that petitioner decided to seek dismissal of its own claim. 614 F.2d at 846.

*USS* has been criticized with one court writing that the decision "is obviously intended to be confined to its facts [and] . . . is of little persuasive effect. . . ." *Horn v. Eltra Corp.,* 686 F.2d 439, 442, fn. 2 (1982).

We conclude that the general rule set out in *Fuller* should be followed here. Unlike *USS,* the subject matter

jurisdiction of the trial court never properly attached to the original petitioners because they lacked standing to seek review of Stanchfield's decision. Further, subject-matter jurisdiction can never attach to the intervenors' claims because they cannot meet the strict filing requirements set out in sec. 227.16(1), Stats. Consequently, refusing to allow the intervenors to continue to press their claims here will not result in a new suit which will only bring the parties back to the point they are at now.

We are not unmindful of the fact that our decision means that the persons who clearly had standing to challenge the administrative decision will not be able to press their claims. However, that result is mandated by sec. 227.16(1), Stats., this court's decision in *WED II* and the general rule set out in *Fuller*. The time limit set out in sec. 227.16(1) is akin to a statute of limitations. As with all other injuries which may form the basis for a lawsuit, an action must be commenced within the time limits set by statute. Failure to do so means that the alleged injuries can form no basis for judicial review.[16] That is the result here.

*By the Court.*—Decision and order reversed and cause remanded to the trial court to dismiss the petitions for review.

---

[16] We make no comment on the merits of the respondents' claims regarding the adequacy of the FEIS.