# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2019AP299 & 2019AP534 |

| | |
|---|---|
| COMPLETE TITLE: | Friends of the Black River Forest and Claudia Bricks,<br>    Petitioners-Appellants,<br>  v.<br>Kohler Company,<br>    Intervenor-Respondent-Petitioner,<br>Wisconsin Department of Natural Resources and Natural Resources Board,<br>    Respondents-Respondents-Cross Petitioners. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 394 Wis. 2d 523, 950 N.W.2d 685
(2020 – unpublished)

| | |
|---|---|
| OPINION FILED: | June 30, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 1, 2021 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Sheboygan & Dane |
| JUDGE: | Edward L. Stengel & Stephen E. Ehlke |

JUSTICES:
REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ROGGENSACK, and HAGEDORN, JJ., joined. HAGEDORN, J., filed a concurring opinion. KAROFSKY, J., filed a dissenting opinion, in which ANN WALSH BRADLEY and DALLET, JJ., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the intervenor-respondent-petitioner, there were briefs filed by *Deborah C. Tomczyk, Jessica Hutson Polakowski, Monica A. Mark*, and *Reinhart Boerner Van Deuren S.C.,* Madison. There was an oral argument by *Eric A. Shumsky*.

For the respondents-respondents-cross-petitioners, there were briefs filed by *Gabe Johnson-Karp*, assistant attorney general, with whom on the briefs was *Joshua L. Kaul*, attorney general. There was an oral argument by *Gabe Johnson-Karp*.

For the petitioners-appellants, there was a brief filed by *Christa O. Westerberg, Leslie A. Freehil, Aaron G. Dumas* and *Pines Bach LLP*, Madison. There was an oral argument by *Christa O Westerberg*.

Amicus curiae briefs were filed by *Katie Nekola* and *Evan Feinauer* for Clean Wisconsin, Inc.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2019AP299 & 2019AP534
(L.C. No. 2018CV178 & 2018CV2301)

STATE OF WISCONSIN      :      IN SUPREME COURT

Friends of the Black River Forest and Claudia
Bricks,

         Petitioners-Appellants,

   v.

Kohler Company,

         Intervenor-Respondent-Petitioner,

Wisconsin Department of Natural Resources and
Natural Resources Board,

         Respondents-Respondents-Cross

         Petitioners.

**FILED**

**JUN 30, 2022**

Sheila T. Reiff
Clerk of Supreme Court

---

REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ROGGENSACK, and HAGEDORN, JJ., joined. HAGEDORN, J., filed a concurring opinion. KAROFSKY, J., filed a dissenting opinion, in which ANN WALSH BRADLEY and DALLET, JJ., joined.

---

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 REBECCA GRASSL BRADLEY, J. Kohler Company (Kohler), the Natural Resources Board (the Board), and the Department of

Natural Resources (the Department) seek review of a court of appeals decision[1] reversing orders of the circuit court for Sheboygan and Dane Counties dismissing challenges by the Friends of the Black River Forest and Claudia Bricks (collectively, the Friends) to a land exchange between Kohler and the Department.[2] Kohler asserts the Friends do not have standing to challenge the Board's land swap decision under Wis. Stat. §§ 227.52 and 227.53 (2017–18)[3] because their alleged injuries satisfy neither the "injury-in-fact" nor the "zone of interests" elements of the two-part standing analysis, both of which must be satisfied in order to establish standing. Kohler claims the court of appeals decision unlawfully expanded the zone, opening the door to challenges of any agency decision related to the management of state-owned lands. The Department separately contends the Friends lack standing under the "zone of interests" prong.

¶2 We hold the Friends lack standing to challenge the land transfer decision. We assume without deciding that the Friends allege sufficient injuries under the "injury-in-fact" element of the standing test. While historically we have labeled the second prong of the test as a "zone of interests"

---

[1] Friends of the Black River Forest v. DNR, Nos. 2019AP299 & 2019AP534, unpublished slip op. (Wis. Ct. App. Sept. 15, 2020) (per curiam).

[2] The Honorable L. Edward Stengel, Sheboygan County Circuit Court, and the Honorable Stephen E. Ehlke, Dane County Circuit Court, presided.

[3] All subsequent references to the Wisconsin Statutes are to the 2017–18 version unless otherwise indicated.

2

inquiry in line with federal standing principles, this nomenclature has no basis in the text of Wis. Stat. §§ 227.52 or 227.53[4] and does not accurately describe the test we have consistently applied. We ground our decision instead in our well-established formulation for standing to challenge administrative decisions, which requires the alleged injury to adversely affect "an interest which the law recognizes or seeks to regulate or protect." Waste Mgmt. of Wis., Inc. v. DNR, 144 Wis. 2d 499, 505, 424 N.W.2d 685 (1988); see also Foley-Ciccantelli v. Bishop's Grove Condominium Ass'n, Inc., 2011 WI

---

[4] Evidently dissatisfied with the outcome in this case, Justice Karofsky launches a diatribe against textualism. Dissent, ¶¶71-73. Justice Karofsky mimics Justice Dallet's disparagement of textualism and the canons of statutory construction the approach employs as comprising "'a rhetorical smokescreen' obscuring a result-oriented analysis." Id., ¶73; James v. Heinrich, 2021 WI 58, ¶23 n.12, 397 Wis. 2d 517, 960 N.W.2d 350. Like Justice Dallet, Justice Karofsky fundamentally "misunderstands how to interpret legal texts." James, 397 Wis. 2d 517, ¶23 n.12. Justice Karofsky thinks textualism means judges "[j]ust read and apply the law as written. Simple, right?" Dissent, ¶72. Justice Karofsky's conception of textualism is uninformed. "[N]either written words nor the sounds that the written words represent have any inherent meaning. Nothing but conventions and contexts cause a symbol or sound to convey a particular idea." James, 397 Wis. 2d 517, ¶23 n.12 (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts xxvii (2012)). Textualism and the canons which guide its application "represent 'a generally agreed-on approach to the interpretation of legal texts.'" Id. (quoting Scalia & Garner, supra, at xxvii). Justice Karofsky's "marginalization of their role flies in the face of centuries of jurisprudence and her proffered method of statutory interpretation falls on the fringes of acceptable approaches, far outside of the judicial mainstream." Id. "'[L]egislators enact; judges interpret' and the canons simply 'explain how [judges] should perform this task.'" Id. (quoting Scalia & Garner, supra, at xxx).

3

36, ¶55, 333 Wis. 2d 402, 797 N.W.2d 789 (lead opinion) ("[T]he question is whether the party's asserted injury is to an interest protected by a statutory or constitutional provision."); Fox v. DHSS, 112 Wis. 2d 514, 529, 334 N.W.2d 532 (1983) ("[T]he injury must be to a legally protected interest.").

¶3 The Friends alleged injuries resulting from the Board's land swap decision under several statutes and regulations, arguing the interests harmed fall within the zone of interests protected or regulated by these laws. We disagree. None of the statutes or regulations cited protect any legally protected, recognized, or regulated interests of the Friends that would permit them to challenge the Board's decision as "person[s] aggrieved." Accordingly, we reverse the court of appeals.

## I. BACKGROUND

### A. The Land Swap Decision

¶4 Kohler-Andrae State Park (the Park), located on the Lake Michigan shoreline in Sheboygan County, borders private land owned by Kohler. In 2014, Kohler revealed plans to build an 18-hole golf course, which has since become the subject of numerous lawsuits, including this one.[5] In June 2017, the Department initiated a master planning process to consider

---

[5] See Friends of the Black River Forest v. DNR, 2021 WI App 54, 964 N.W.2d 342; Kohler Co. v. DNR, No. 2021AP1187 (Wis. Ct. App., Filed July 12, 2021); Friends of the Black River Forest v. DNR, No. 2019CV000080 (Wis. Cir. Ct. Sheboygan Cnty., Filed Feb. 8, 2019).

Kohler's request to use Park land for the proposed golf course. As part of this process, on February 16, 2018 the Department recommended a land exchange agreement with Kohler, seeking approvals from both the Board and the governor.

¶5 At its next meeting later that month and following public comment, the Board first determined that a 4.59-acre parcel of upland woodland within the Park was "not being used for any park functions" and was no longer needed for the state's use for conservation purposes and therefore removed it from Park boundaries. The Board next approved an agreement between the Department and Kohler for a land exchange, under which the Department would transfer the 4.59 acres to Kohler, in addition to a 1.88-acre easement, in exchange for 9.5 acres of Kohler land——including upland woodland, crop land, and a building—— straddling the boundary of the Park. Kohler planned to use the 4.59 acres for a maintenance facility and parking area, and the easement for public access to the golf course. The agreement required "[r]estrictions placed on the deed transferring title to Kohler" in order to "ensure that" the transferred land "is adequately landscaped and screened, that its use will not compromise park aesthetics, and that its proposed future use will be compatible with adjacent park uses."

B. The Friends' Amended Petition and Circuit Court Proceedings

¶6 The Friends filed a Wis. Stat. ch. 227 petition in Sheboygan County Circuit Court seeking review of the Board's February 28, 2018 "vote to convey 4.89 acres of land within Kohler-Andrae State Park to Kohler Co., as well as a 1.88 acre

5

easement."[6]  Kohler intervened and filed a motion to dismiss under Wis. Stat. § 227.56(3), arguing that the Friends were not an "aggrieved" party because, as relevant here, they failed to satisfy both the "injury in fact" and "zone of interest" prongs of the test for Chapter 227 standing.  The Friends filed an Amended Petition, identifying the following alleged injuries from the land exchange:

> 24. Petitioners are aggrieved by the Respondents' decisions to approve the land transaction.  The Respondents' decision permanently eliminates Petitioners' opportunity to use land within Kohler Andrae State Park currently available to the public for recreation and enjoyment, which members of FBRF such as Ms. Felde and Ms. Bricks have used and enjoyed previously, and would continue to use and enjoy but for Respondents' decision.

> 25. The Respondents' decision will also reduce habitat for and populations of plants, birds, and animals that are currently enjoyed by FBRF members such as Ms. Felde, as well as Ms. Bricks, harming their ability to observe wildlife and study nature in and around the park.

> 26. The Respondents' decision will impact and reduce enjoyment of other resources used by FBRF members such as Ms. Felde, as well as Ms. Bricks, including areas of the park adjacent to the proposed road and maintenance facility.  Construction of Kohler Co.'s facility will harm the aesthetics of these adjacent

---

[6] The Friends also filed a common law certiorari action in Dane County Circuit Court against the Board, challenging the same land swap decision.  Kohler and the Board moved to dismiss. The Dane County Circuit Court dismissed the complaint under Wis. Stat. § 802.06(2)(a)10.  This case was consolidated with the Sheboygan County case on appeal, and the court of appeals reversed and remanded the Dane County Circuit Court's decision, concluding it erred in dismissing the complaint. Friends of the Black River Forest, Nos. 2019AP299 & 2019AP534, at ¶3.

areas and impair Petitioners' use and enjoyment of the areas for recreation and conservation.

27. FBRF and its members, including Ms. Felde and Ms. Bricks, will be affected by increased traffic and noise caused in and around the park by the Respondents' decision, as Kohler Co.'s project is constructed and operated.

28. FBRF and its members, including Ms. Felde and Ms. Bricks, are also interested in the Respondents following required procedures for state park planning that ensure uses in the park are properly classified to avoid user conflicts and preserve recreational and scenic qualities, and are aggrieved by the Respondents' decision to follow procedures in this case.

¶7 The Sheboygan County Circuit Court determined the Friends lacked standing because the alleged injuries did not flow directly from the land swap decision and accordingly granted Kohler's motion to dismiss. Reasoning that "[t]he land swap agreement does not clear the way for the immediate construction of the proposed golf course or any other structures," the circuit court concluded the Friends failed to meet the first element of the two-part test establishing that they were aggrieved because none of the alleged injuries were a direct consequence of the land transfer. Consequently, the court did not address the "zone of interests" element of the standing analysis.

C. The Court of Appeals' Decision

¶8 The court of appeals, in an unpublished, per curiam opinion, reversed and remanded the decision of the Sheboygan County Circuit Court and held that the Friends alleged sufficient injuries to satisfy standing under Wis. Stat.

7

§§ 227.52 and 227.53. <u>Friends of the Black River Forest v. DNR</u>, Nos. 2019AP299 & 2019AP534, unpublished slip op., ¶3 (Wis. Ct. App. Sept. 15, 2020) (per curiam). That court determined the alleged injuries included "recreational, aesthetic, and conservational injuries caused by the land exchange." <u>Id.</u>, ¶17. Looking "beyond the land exchange to the sequence of events that has been set in motion," including Kohler's desired end result of the construction of the golf course, the court of appeals determined the Friends' alleged injuries were neither hypothetical nor conjectural, and had a close causal relationship "to a change in the physical environment precipitated by the land exchange," satisfying the first element of the standing inquiry. <u>Id.</u>, ¶¶19-27.

¶9 The court of appeals also concluded the Friends satisfied the "zone of interests" prong by alleging injuries to interests recognized by law, including Wis. Stat. §§ 23.11, 23.15, 27.01(1), and Wis. Admin. Code chs. NR 1 & 44. <u>Id.</u>, ¶¶28-32. Kohler petitioned for review, the Department cross-petitioned, and we granted both petitions.

## II. STANDARD OF REVIEW

¶10 "Whether a party has standing is a question of law that we review independently." <u>City of Mayville v. DOA</u>, 2021 WI 57, ¶15, 397 Wis. 2d 496, 960 N.W.2d 416 (citing <u>Marx v. Morris</u>, 2019 WI 34, ¶21, 386 Wis. 2d 122, 925 N.W.2d 112). In reviewing a motion to dismiss a petition seeking judicial review of an agency decision, we determine "whether a petition on its face states 'facts sufficient to show that the petitioner named

8

therein is aggrieved . . . by the decision sought to be reviewed.'" Wisconsin's Env't Decade, Inc. v. Pub. Serv. Comm'n of Wis. (WED I), 69 Wis. 2d 1, 8, 230 N.W.2d 243 (1975).

¶11 On review of a motion to dismiss for lack of standing, the court must "take all facts alleged by [the petitioner] to be true in determining whether he has standing to bring his claim." McConkey v. Van Hollen, 2010 WI 57, ¶14 n.5, 326 Wis. 2d 1, 783 N.W.2d 855 (citing Repetti v. Sysco Corp., 2007 WI App 49, ¶2, 300 Wis. 2d 568, 730 N.W.2d 189). In evaluating a Wis. Stat. ch. 227 motion to dismiss, we apply "the rules that the allegations of the petition are assumed to be true; that the allegations are entitled to a liberal construction in favor of the petitioner; and that this court is not concerned with the ability of the petitioner to prove the facts alleged at trial." WED I, 69 Wis. 2d at 8-9.

### III. DISCUSSION

¶12 Because Wisconsin's current standing analysis is derived from federal standing principles, we begin there. We then discuss the principles of standing under Wisconsin law, including the two prongs of the standing test in the context of a petition for judicial review under Wis. Stat. ch. 227. Next, we explain how the "zone of interests" prong represents an improper departure from Wisconsin standing principles and a misnomer in the context of our well-established test. Finally, assuming without deciding that the Friends' injuries satisfy the "injury-in-fact" prong of the standing test, we conclude none of the statutes or regulations cited by the Friends "recognize[] or

seek[] to regulate or protect" the Friends' asserted interests. Waste Mgmt., 144 Wis. 2d at 505. Accordingly, for purposes of standing, the Friends fail to establish they are "person[s] aggrieved" within the meaning of Wis. Stat. §§ 227.52, 227.53(1), and 227.01(9), whose "substantial interests are adversely affected by a determination of" the Board.

## A. Federal Standing Principles

¶13 In federal court, "[t]here are two concepts of standing." See, e.g., MainStreet Org. of Realtors v. Calumet City, 505 F.3d 742, 744 (7th Cir. 2007). "There is Article III standing, which requires just an injury in fact, and 'prudential' standing, a more complex, judge-made concept of standing. . . . This doctrine precludes the federal courts from exercising jurisdiction over some types of case[s] that Article III would not forbid the courts to adjudicate." Id. at 744–45. Under the "irreducible constitutional minimum of standing" identified by federal courts, a plaintiff "must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 125 (2014) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)); see also Bank of America Corp. v. City of Miami, 137 S. Ct. 1296, 1302 (2017). This standing threshold arises from Article III, which limits the jurisdiction of federal courts to "cases" or

10

"controversies." McConkey, 326 Wis. 2d 1, ¶15 n.6 (quoting U.S. Const. art. III, § 2, cl. 1).

¶14 Apart from the "constitutional minimum" of an "injury in fact" that is "fairly traceable" to the defendant's conduct and likely to be "redressed by a favorable decision," see Bennett v. Spear, 520 U.S. 154, 162 (1997), "prudential standing" encompasses "judicially self-imposed limits on the exercise of federal jurisdiction . . . founded in concern about the proper—and properly limited—role of the courts in a democratic society[.]" Id. (quotations omitted). The "prudential standing" doctrine has traditionally included the "zone of interests" inquiry, which first appeared in Association of Data Processing Service Orgs., Inc. v. Camp, 397 U.S. 150 (1970) and its companion case, Barlow v. Collins, 397 U.S. 159 (1970). See Bennett, 520 U.S. at 162–63. In Data Processing, the United States Supreme Court explained that a plaintiff challenging an administrative agency decision under the Administrative Procedure Act (the APA) must meet the two-pronged standing requirement, including suffering an "injury in fact" within the "zone of interests to be protected or regulated by the statute or constitutional guarantee in question."[7] 397 U.S. at 153.

---

[7] The statutory language of the APA, interpreted by Data Processing, provided, "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5. U.S.C.A. § 702 (1964 ed., Supp. IV).

11

¶15 The United States Supreme Court later clarified in Lexmark that the "zone of interests" inquiry is more appropriately understood as a question of whether a cause of action exists, rather than a matter of "prudential standing." Lexmark, 572 U.S. at 127. As framed by Lexmark, this inquiry requires the Court to "determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Id. (citing Steel Co. v. Citizens for Better Environment, 523 U.S. 83, 97 & n.2 (1998); Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 394-95 (1987); Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 288 (1992) (Scalia, J., concurring in judgment)). The Court elaborated:

> In sum, the question this case presents is whether . . . [the plaintiff] has a cause of action under the statute. That question requires us to determine the meaning of the congressionally enacted provision creating a cause of action. In doing so, we apply traditional principles of statutory interpretation. We do not ask whether in our judgment Congress should have authorized [the plaintiff's] suit, but whether Congress in fact did so. . . . Thus, this case presents a straightforward question of statutory interpretation: Does the cause of action in [the statute] extend to [the plaintiff]?

Id. at 128-29.

¶16 In the context of the APA, the Lexmark Court explained that the "lenient" zone-of-interests approach "is an appropriate means of preserving the flexibility of the APA's omnibus judicial-review provision, which permits suit for violations of numerous statutes of varying character that do not themselves

12

include causes of action for judicial review." Id. at 130. Nevertheless, the Court emphasized "that the breadth of the zone of interests varies according to the provisions of law at issue, so that what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the 'generous review provisions' of the APA may not do so for other purposes." Id. at 130 (quoting Bennett, 520 U.S. at 163) (internal quotation marks omitted). Finally, the Lexmark Court clarified that the zone of interests test "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that' Congress authorized that plaintiff to sue." Id. (quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 225 (2012)).

B. Standing Principles in Wisconsin

¶17 Federal law on standing is not binding in Wisconsin. Foley-Ciccantelli, 333 Wis. 2d 402, ¶46 n.23 (lead op.); see also id., ¶46 n.24 (citing WED I, 69 Wis. 2d at 11; Metro Builders Ass'n of Greater Milwaukee v. Village of Germantown, 2005 WI App 103, ¶13, 282 Wis. 2d 458, 698 N.W.2d 301) ("Federal standing terminology has been used in cases that do not involve constitutional challenges."). Because our state constitution lacks the jurisdiction-limiting language of its federal counterpart, "standing in Wisconsin is not a matter of jurisdiction, but of sound judicial policy." McConkey, 326 Wis. 2d 1, ¶15 (citing Zehetner v. Chrysler Fin. Co., 2004 WI App 80, ¶12, 272 Wis. 2d 628, 679 N.W.2d 919); see also Wis.

13

Legis. v. Palm, 2020 WI 42, ¶12, 391 Wis. 2d 497, 942 N.W.2d 900 (quoting Schill v. Wis. Rapids Sch. Dist., 2010 WI 86, ¶38, 327 Wis. 2d 572, 786 N.W.2d 177 (lead op.)). Nevertheless, Wisconsin has largely embraced federal standing requirements, and we "look to federal case law as persuasive authority regarding standing questions." McConkey, 326 Wis. 2d 1, ¶15 n.7 (citing WED I, 69 Wis. 2d at 11).

¶18 Although not constitutionally required, we have described our two-step standing approach as "conceptually similar to the analysis required by the federal rule." WED I, 69 Wis. 2d at 10. As a matter of "sound judicial policy," McConkey, 326 Wis. 2d 1, ¶15, typically our courts ask first "whether the decision of the agency directly causes injury to the interest of the petitioner" and second "whether the interest asserted is recognized by law." WED I, 69 Wis. 2d at 10. We likened this approach to the federal two-pronged standing inquiry: "(1) Does the challenged action cause the petitioner injury in fact? and (2) is the interest allegedly injured arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question?" Id. (citing Data Processing Service, 397 U.S. at 153); see also Waste Mgmt., 144 Wis. 2d at 509 ("[T]he Wisconsin standing analysis is conceptually similar to the federal analysis."); Cornwell Pers. Assocs., Ltd. v. DILHR, 92 Wis. 2d 53, 61, 284 N.W.2d 706 (Ct. App. 1979) ("The Wisconsin Supreme Court construed ['person aggrieved'] to impose a standing requirement similar to the federal rule in [WED I].").

14

¶19 We construe the law of standing "liberally, and 'even an injury to a trifling interest' may suffice." McConkey, 326 Wis. 2d 1, ¶15 (quoting Fox, 112 Wis. 2d at 524); see also WED I, 69 Wis. 2d at 13 (citing Kubista v. State Annuity & Inv. Bd., 257 Wis. 359, 43 N.W.2d 470 (1950)). At the same time, "while standing is to be liberally construed, the claim asserted must be legally recognizable in Wisconsin jurisprudence." Foley-Ciccantelli, 333 Wis. 2d 402, ¶165 (Roggensack, J., concurring) (citing Krier v. Vilione, 2009 WI 45, ¶22, 317 Wis. 2d 288, 766 N.W.2d 517).

¶20 In the context of judicial review of an administrative decision, standing is governed by Wis. Stat. §§ 227.52 and 227.53. See WED I, 69 Wis. 2d at 9; Waste Mgmt., 144 Wis. 2d at 504. "Both sections require a petitioner to 'show a direct effect on his legally protected interests.'" Fox, 112 Wis. 2d at 524 (quoting WED I, 69 Wis. 2d at 9). Section 227.52 provides, in relevant part:

> Administrative decisions which adversely affect the substantial interests of any person, whether by action or inaction, whether affirmative or negative in form, are subject to review as provided in this chapter, except as otherwise provided by law and [certain exceptions.]

§ 227.52. Section 227.53(1) provides, as pertinent:

> Except as otherwise specifically provided by law, any person aggrieved by a decision specified in s. 227.52 shall be entitled to judicial review of the decision as provided in this chapter and subject to [certain] procedural requirements[.]

15

§ 227.53(1). Chapter 227 defines "[p]erson aggrieved" as "a person or agency whose substantial interests are adversely affected by a determination of an agency." Wis. Stat. § 227.01(9).

¶21 In applying the first element of standing——"injury in fact"——we ask "whether the petition alleges injuries that are a direct result of the agency action." WED I, 69 Wis. 2d at 13. We have applied the federal standard, maintaining that an "[i]njury alleged, which is remote in time or which will only occur as an end result of a sequence of events set in motion by the agency action challenged, can be a sufficiently direct result of the agency's decision to serve as a basis for standing." Id. at 14. Nevertheless, the injuries must be neither hypothetical nor conjectural. Milwaukee Brewers Baseball Club v. DHSS, 130 Wis. 2d 56, 65, 387 N.W.2d 245 (1986).

¶22 In cases alleging harm to the environment, "injuries 'must show a direct causal relationship to a proposed change in the physical environment.'" Applegate-Bader Farm, LLC v. DOR, 2021 WI 26, ¶17 n.7, 396 Wis. 2d 69, 955 N.W.2d 793 (quoting Fox, 112 Wis. 2d at 528). In the environmental context, the "federal test [established in Data Processing Service, 397 U.S. at 153] has been viewed as a substantial liberalization of the standing requirements." WED I, 69 Wis. 2d at 10 (citing Kenneth Culp Davis, The Liberalized Law of Standing, 37 U. Chi. L. Rev. 450 (1970); Donald W. Large, Is Anybody Listening? The Problem of Access in Environmental Litigation, 1972 Wis. L. Rev. 62,

16

94). Since then, we have concluded that "allegations of injury to aesthetic, conservational, recreational, health and safety interests will confer standing so long as the injury is caused by a change in the physical environment." Milwaukee Brewers, 130 Wis. 2d at 65 (citing Metro. Edison v. People Against Nuclear Energy, 460 U.S. 766, 771–73 (1983); Joseph v. Adams, 467 F. Supp. 141, 156 (E.D. Mich. 1978); Fox, 112 Wis. 2d at 525). "The question of whether the injury alleged will result from the agency action in fact is a question to be determined on the merits, not on a motion to dismiss for lack of standing." WED I, 69 Wis. 2d at 14.

¶23 Under what we have described as the "zone of interests" prong of the analysis, expressed in terms derived from federal standing cases——we ask whether "the injury is to an interest which the law recognizes or seeks to regulate or protect." Waste Mgmt., 144 Wis. 2d at 505. This inquiry requires us to "examine a specific statute to determine standing rather than consider all interests of the petitioner." MCI Telecomms. Corp. v. Pub. Serv. Comm'n, 164 Wis. 2d 489, 493, 476 N.W.2d 575 (Ct. App. 1991). In WED I, we acknowledged the federal courts' "willingness to find that environmental interests are arguably within the zone of interest[s] protected by virtually any statute related to environmental matters." WED I, 69 Wis. 2d at 10–11 (citing Env't Def. Fund, Inc. v. Hardin, 428 F.2d 1093 (D.C. Cir. 1970); W. Va. Highlands Conservancy v. Island Creek Coal Co., 441 F.2d 232 (4th Cir. 1971); Citizens Comm. for Hudson Valley v. Volpe, 425 F.2d 97 (2d Cir. 1970)).

17

¶24 For example, federal courts have determined the National Environmental Protection Act (NEPA) provides an adequate basis "for standing to challenge an agency's failure to comply with its provisions." WED I, 69 Wis. 2d at 19 (citing United States v. SCRAP, 412 U.S. 669 (1973); W. Va. Highlands Conservancy, 441 F.2d at 232; Scherr v. Volpe, 336 F. Supp. 882 (W.D. Wis. 1971)).  We have likewise concluded that the Wisconsin Environmental Policy Act (WEPA) "does, similar to NEPA, recognize an interest sufficient to give a person standing to question compliance with its conditions where it is alleged that the agency's action will harm the environment in the area where the person resides."[8]  Id.

¶25 Having been adopted from federal jurisprudence interpreting the APA, the "zone of interests" terminology is

---

[8] In our prior cases recognizing standing in the environmental context, the petitioners successfully sought to challenge the administrative decision at issue under WEPA. See, e.g., Applegate-Bader Farm, LLC v. DOR, 2021 WI 26, ¶17 n.7, 396 Wis. 2d 69, 955 N.W.2d 793 (concluding Applegate had standing to challenge DOR's decision not to prepare an environmental impact statement (EIS) because it alleged "an injury in fact to its legally protected conservational interest" under WEPA); Milwaukee Brewers Baseball Club v. DHSS, 130 Wis. 2d 56, 70, 387 N.W.2d 245 (1986) (determining petitioners alleged injuries sufficient to acquire standing under WEPA); Wisconsin's Env't Decade, Inc. v. Pub. Serv. Comm'n of Wis. (WED I), 69 Wis. 2d 1, 19, 230 N.W.2d 243 (1975) (holding that WEPA "recognize[s] an interest sufficient to give a person standing to question compliance with its conditions where it is alleged that the agency's action will harm the environment in the area where the person resides").  In this case, an environmental impact study was performed and the Friends have not asserted the Department made a negative-EIS decision nor have they brought any claim under WEPA.

18

untethered to the text of Wis. Stat. ch. 227 and obscures the standing test we have consistently applied in challenges to administrative decisions. Chapter 227 authorizes persons who are "aggrieved" to seek judicial review of administrative decisions. Wis. Stat. § 227.53(1). A "person aggrieved" is defined as "a person or agency whose substantial interests are adversely affected by a determination of an agency." Wis. Stat. § 227.01(9). Consistent with our longstanding application of this test for standing purposes, the adversely affected interest must be protected, recognized, or regulated by law. The determination of whether a statute protects, recognizes, or regulates the asserted interest is a purely statutory inquiry, from which the judicially subjective consideration of the "zone of interests" is properly omitted. This has been our consistent jurisprudential practice and we do not depart from it now.

¶26 The statutory history of Wis. Stat. §§ 227.52 and 227.53 confirms the "zone of interests" language is grounded neither in the statutory text governing administrative challenges nor in our longstanding conception of standing. Prior to 1976, Wis. Stat. ch. 227 had not defined "person aggrieved"; in the absence of a statutory definition, we applied the definition articulated in Greenfield v. Joint County School Comm., under which an "aggrieved party" meant "one having an interest recognized by law in the subject matter which is injuriously affected by the judgment." See Pasch v. DOR, 58 Wis. 2d 346, 357, 206 N.W.2d 157 (1973) (quoting Greenfield, 271 Wis. 442, 447, 73 N.W.2d 580 (1955)). The WED I court relied on

19

_Greenfield_'s definition of "a person aggrieved."  WED I, 69
Wis. 2d at 9-10 (quoting _Greenfield_, 271 Wis. at 447).  The
court explained:

> We have held that a person must be "aggrieved" and
> "directly affected" by the agency decision, and also
> that the decision must "directly affect the legal
> rights, duties or privileges" of the person seeking
> review.  [Sections] 227.15 and 227.16 do not, however,
> create separate and independent criteria.  It is clear
> that both sections essentially require the petitioner
> to show a direct effect on his legally protected
> interests.[9]

Id. at 9.  At the same time, WED I improperly framed its inquiry
in terms of the federal "zone of interests" test, with no
support in the text of Chapter 227 or our prior enunciation of
standing principles.[10]

---

[9] Wis. Stat. §§ 227.15 and 227.16 were the precursors to
Wis. Stat. §§ 227.52 and 227.53.  The statutes were renumbered
in 1986.  See 1985 Wis. Act 182, §§ 35, 37.

[10] Even though it described the Wisconsin standing test as
similar to the federal "zone of interests" test, WED I seemingly
adhered to the "legally protected interest" test by asking
"whether the interest asserted is recognized by law."  WED I, 69
Wis. 2d at 14.  The WED I court concluded, "WED's members, who
are customers in the area affected by the PSC's order in this
case, have a sufficient interest under the cited sections of ch.
196, Stats., in the future adequacy of their service, and that
WED has standing, if the facts alleged in the petition are true,
to challenge the PSC's failure to consider conservation
alternatives to the proposed priority system."  Id. at 17.  WED
I partly based its determination on the "express recognition of
the protective purposes of the law," as determined by Wisconsin
P. & L. Co. v. Pub. Serv. Comm'n, 45 Wis. 2d 253, 259, 172
N.W.2d 639 (1969).  Id. at 16.  At the same time, WED I
recognized standing under WEPA, which it stated "recognize[s] an
interest sufficient to give a person standing to question
compliance with its conditions where it is alleged that the
agency's action will harm the environment in the area where the
person resides."  Id. at 19.  We have consistently recognized

¶27 In 1976, the legislature made a number of relevant amendments to Wis. Stat. ch. 227. See Chapter 414, Laws of 1975. First, the legislature amended Wis. Stat. § 227.15 so that administrative decisions formerly required to "directly affect the legal rights, duties or privileges," now must "adversely affect the substantial interests of any person" to be subject to judicial review.[11]  § 19, ch. 414, Laws of 1975. Second, the legislature removed "directly affected" from § 227.16(1), rewording the statute to allow "any person aggrieved by a decision specified in s. 227.15" to "be entitled to judicial review thereof[.]"[12]  § 20, ch. 414, Laws of 1975. Third, the legislature defined "person aggrieved" to "include[]

---

broad environmental interests under WEPA for standing purposes. See supra, ¶24 n.8.  The petitioners have not brought such a claim in this case.

[11] The previous language provided, as relevant:

227.15 Judicial review; orders reviewable. Administrative decisions, which directly affect the legal rights, duties or privileges of any person, whether affirmative or negative in form, . . . shall be subject to judicial review as provided in this chapter[.]

Wis. Stat. § 227.15 (1973-74).

[12] The previous language provided, as relevant:

227.16 Parties and proceedings for review. (1) Except as otherwise specifically provided by law, any person aggrieved by a decision specified in s. 227.15 and directly affected thereby shall be entitled to judicial review thereof as provided in this chapter.

Wis. Stat. § 227.16(1) (1973-74).

any person or agency whose substantial interests are adversely affected by a determination of an agency." § 5, ch. 414, Laws of 1975. For purposes of standing, our subsequent cases have not treated these statutory changes as either abrogating our longstanding requirement that an alleged injury must be "to an interest which the law recognizes or seeks to regulate or protect," nor endorsing the "zone of interests" formulation described in WED I. Waste Mgmt., 144 Wis. 2d at 504-05; see also Milwaukee Brewers, 130 Wis. 2d at 65 ("[T]he Petitioner must show that the alleged injury is an injury to a legally protected interest."); Fox, 112 Wis. 2d at 529 ("[T]he injury must be to a legally protected interest.").

¶28 We conclude the "zone of interests" nomenclature WED I superimposed on Wisconsin's test for standing has no basis in the text of Wis. Stat. ch. 227, which limits judicial review to any "person or agency whose substantial interests are adversely affected by a determination of an agency." See Wis. Stat. §§ 227.01(9), 227.52, 227.53(1). The "zone of interests" test risks an improper judicial overextension of our well-established standing requirement that a person aggrieved by an agency decision must allege an injury "to an interest which the law recognizes or seeks to regulate or protect." Waste Mgmt., 144 Wis. 2d at 505. As substantively reflected in many of our prior decisions, this inquiry centers on a textually-driven analysis of the language of the specific statute cited by the petitioner as the source of its claim to determine whether that statute "recognizes or seeks to regulate or protect" the interest

22

advanced by the petitioner.[13] Id. at 505, 508; see also Air Courier Conf. of Am. v. Am. Postal Workers Union AFL-CIO, 498 U.S. 517, 529 (1991) ("[T]he relevant statute [under the APA] of course, is the statute whose violation is the gravamen of the complaint." (quoting Lujan, 497 U.S. at 886)).

¶29 In WED I, this court misguidedly described this prong of the standing test——citing an administrative law treatise as sole authority for the proposition——as follows: "The only

_____

[13] This textually-driven analysis means the language of the cited statutes drives the inquiry into whether the injured interest is "protected, recognized, or regulated" by the law. See Waste Mgmt., 144 Wis. 2d at 508. Despite accepting and ostensibly applying this test, which it frames as "a 'statutory question,'" the dissent misconstrues our application of this "decades-old framework" as "prejudging the merits" and "conflating standing with statutory interpretation." See dissent, ¶¶53, 59, 67 (citing Moustakis v. DOJ, 2016 WI 42, ¶3 n.2, 368 Wis. 2d 677, 880 N.W.2d 142). The dissent's irreconcilable dual critique confuses the law of standing in administrative cases. On the one hand, the dissent says it accepts and applies our precedent that directs us to engage in statutory interpretation. Id., ¶¶75, 82 (citing State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶¶46, 48–49, 271 Wis. 2d 633, 681 N.W.2d 110). On the other hand, the dissent also suggests that statutory interpretation is an improper component of standing. Id., ¶67 (citing Moustakis, 368 Wis. 2d 677, ¶3 n.2). The dissent may believe the statutes on which the Friends base their claims "protect[], recognize[], or regulate[]" their injured interests just as the dissent believes substantive criteria are not required, but positing the inquiry itself is somehow improper would overturn the entirety of our Wis. Stat. ch. 227 cases with a single footnote from a case having nothing to do with Chapter 227. See Moustakis, 368 Wis. 2d 677, ¶3 n.2. Notably, the dissent does not attempt to develop this point because its analysis in fact adheres to the longstanding legal requirement that we analyze the statutes cited by petitioners to determine whether they "recognize[], protect[], or regulate[]" the Friends' injured interests. Dissent, ¶77 (citing Waste Mgmt., 144 Wis. 2d at 505).

problems about standing should be what interests deserve protection against injury, and what should be enough to constitute an injury. Whether interests deserve legal protection depends upon whether they are sufficiently significant and whether good policy calls for protecting them or for denying them protection." See WED I, 69 Wis. 2d at 13 (quoting Kenneth Culp Davis, Administrative Law Treatise § 22.00-4, at 722 (1970 Supp.)). In expressing standing in Chapter 227 cases in terms of what "should be" and what constitutes "good policy," this court cloaked itself with legislative powers rather than adhering to its judicial duty to say what the law is and not what the court may wish it to be. If the "zone of interests" test comprises the WED court's formulation of it, this court would be compelled to reject it. However, in subsequent cases, this court grounded the inquiry in the text of the statutes or regulations cited, rather than in judicial notions of what "should be" or what may constitute "good policy."

¶30 While Wisconsin cases frequently reference the "zone of interests" test, they rarely apply it in the manner described by WED I. See, e.g., Foley-Ciccantelli, 333 Wis. 2d 402, ¶56 (lead op.) (explaining that the phrase "legally protectable interest" "is used in the case law to mean 'an interest within the zone of interests protected by a statute or constitution'"). While discarding this anachronistic misnomer, we retain our well-established standing test. Although the dissent characterizes this clarification as a "twist[]" that "creat[es]

24

additional barriers to judicial review,"[14] removing the "zone of interests" label leaves the test's substance intact: "the injury" must be "to an interest which the law recognizes or seeks to regulate or protect."[15] Waste Mgmt., 144 Wis. 2d at 505.

¶31 In Waste Mgmt., this court framed "the issue presented for our review" as "the statutory question of whether, under secs. 227.15 and 227.16(1)" the statute to which the petitioner pointed as the source of its protected interests "operates to grant standing." Id. at 503-04 (emphasis added). In that case, the court explained Wisconsin's "zone of interests" test asks whether "the injury is to an interest which the law recognizes or seeks to regulate or protect." Id. at 505. Properly absent from the analysis were any considerations of whether the asserted interests "deserve" legal protection; instead, the court tailored the test to whether the law actually affords the asserted interest legal protection. See also Applegate-Bader Farm, 396 Wis. 2d 69, ¶17 n.7 ("A party has standing to

---

[14] Dissent, ¶89.

[15] The dissent claims no party asked us to "overhaul" the zone of interests limitation, and that "[d]eciding this issue, when no one asked us to do so, both deprives our deliberations of analysis refined in the fires of adversarial litigation and unfairly surprises the parties." Dissent, ¶57. This overblown assertion overlooks decades of precedent demonstrating that the "zone of interests" label does not accurately reflect the test we have consistently applied and apply no differently in this case. Our conclusion seeks not to avoid the "fires of adversarial litigation" but to extinguish any last embers of a fire that has long since died out.

challenge an administrative decision when 'the decision of an agency directly causes injury to the interest of the petitioner' and if the 'interest asserted is recognized by law."); Milwaukee Brewers, 130 Wis. 2d at 65 ("In addition to showing a direct injury" requiring petitioner to "show that the alleged injury is an injury to a legally protected interest" rather than within a "zone of interests"); Fox, 112 Wis. 2d at 529 (phrasing the second prong of the standing test as "the injury must be to a legally protected interest" and making no mention of a "zone of interests" test).   Recognizing that the second prong of the standing test requires the allegedly adversely affected interest to be one protected, recognized, or regulated by an identified law, we next consider whether the interests asserted by the Friends satisfy this element of standing.

C.   The Statutes Cited Do Not Protect or Regulate the Friends'
Asserted Interests

¶32 The Friends allege five aesthetic, recreational, conservational, and procedural injuries arising from the land-swap decision.[16]   We assume without deciding the Friends' alleged injuries satisfy the first prong of the standing analysis.

---

[16] The dissent hyperbolically concludes the Department will have "the unfettered right to redraw all state park boundaries" and "not a single Wisconsin citizen . . . could challenge that conduct in court."   Dissent, ¶89.   Nothing in our opinion supports such a bewildering misconception.   Our standing review in this case is limited by the Friends' Amended Petition challenging the "decision to convey" the property to Kohler, under the statutes identified by the Friends.   See id., ¶77. The dissent premises its entire analysis on a basic misreading of the Friends' claims.   See infra, ¶45 n.21.

Standing to challenge an agency decision under Wis. Stat. §§ 227.52 and 227.53 also requires the Friends to identify a statute protecting or regulating the interests they allege were injured by the decision.   While the Friends cite several statutes and regulations to support their standing argument, none of them protect or regulate their asserted interests.

1.   Wisconsin Stat. §§ 27.01, 23.11 & 23.15

¶33 The Friends first point to Wis. Stat. § 27.01(1),[17] which describes the purpose of the state parks system.   The statute declares it is "the policy of the legislature to acquire, improve, preserve and administer a system of areas to be known as the state parks of Wisconsin.   The purpose of the state parks is to provide areas for public recreation and for public education in conservation and nature study."   § 27.01(1). Such a statutory statement of purpose, however, "does not provide for an independent, enforceable claim, as it is not in

---

[17] Section 27.01(1) provides in full:

Purpose.   It is declared to be the policy of the legislature to acquire, improve, preserve and administer a system of areas to be known as the state parks of Wisconsin. The purpose of the state parks is to provide areas for public recreation and for public education in conservation and nature study. An area may qualify as a state park by reason of its scenery, its plants and wildlife, or its historical, archaeological or geological interest. The department shall be responsible for the selection of a balanced system of state park areas and for the acquisition, development and administration of the state parks. No admission charge shall be made to any state park, except as provided in subs. (7) to (9).

itself substantive." Schilling v. Crime Victims Rts. Bd., 2005 WI 17, ¶14, 278 Wis. 2d 216, 692 N.W. 2d 623. Merely expressing a statement of purpose, nothing in § 27.01(1) establishes the requisite "substantive criteria" by which petitioners could challenge the Department's or the governor's decisions impacting state parks. Chenequa Land Conservancy, Inc. v. Village of Hartland, 2004 WI App 144, ¶21, 275 Wis. 2d 533, 685 N.W.2d 573. Lacking such substantive criteria, nothing in § 27.01 protects, recognizes, or regulates any person's interests or contemplates a challenge to the agency's decision to convey the land to Kohler.

¶34 The Friends also assert Wis. Stat. § 23.11[18] affords them standing, focusing on the following statutory language: "In addition to the powers and duties heretofore conferred and imposed upon said department by this chapter it shall have and take the general care, protection and supervision of all state

---

[18] Section 23.11(1) provides in full:

In addition to the powers and duties heretofore conferred and imposed upon said department by this chapter it shall have and take the general care, protection and supervision of all state parks, of all state fish hatcheries and lands used therewith, of all state forests, and of all lands owned by the state or in which it has any interests, except lands the care and supervision of which are vested in some other officer, body or board; and said department is granted such further powers as may be necessary or convenient to enable it to exercise the functions and perform the duties required of it by this chapter and by other provisions of law. But it may not perform any act upon state lands held for sale that will diminish their salable value.

28

parks[.]"[19]  Similar to Wis. Stat. § 27.01, this statute lacks any "substantive criteria" by which petitioners could challenge the Board's decisions regarding state parks and nothing in the text protects, recognizes, or regulates any person's interest in state parks or contemplates a challenge to agency action related to state parks.

¶35 The Friends' reliance on Wis. Stat. § 23.15 is likewise unavailing.  That statute provides for the sale of state-owned lands by the Board and includes a number of procedures by which the Board is to conduct such sales, including gubernatorial approval.  The statute provides, in part:

> The natural resources board may sell, at public or private sale, lands and structures owned by the state under the jurisdiction of the department of natural resources, . . . when the natural resources board determines that the lands are no longer necessary for the state's use for conservation purposes[.]

§ 23.15(1).  The statute further requires the Board to "present to the governor a full and complete report of the lands to be sold, the reason for the sale, the price for which said lands should be sold together with an application for the sale of the

---

[19] Although the Friends did not include Wis. Stat. § 23.11 among the "Grounds for Review" in its Amended Petition for Judicial Review, the Friends did allege the Department "is responsible for the general care, protection and supervision of all state parks pursuant to Wis. Stat. § 23.11." Because we review a motion to dismiss, we elect to apply a liberal construction of the Amended Petition in favor of the Friends and therefore consider § 23.11 as a basis for Friends' claims. See WED I, 69 Wis. 2d at 8.

same." § 23.15(2). The governor shall then investigate the sale "as the governor deems necessary" and "approve or disapprove such application." Id.

¶36 Nothing in Wis. Stat. § 23.15, including its other procedural requirements relating to land sales, empowers private parties alleging environmental injuries to challenge Board decisions under this land-management provision. Wisconsin Stat. § 23.15 contains no textual indication that this statute protects, recognizes, or regulates any individual's interests that might be injured by a decision to exchange state-owned land for privately-owned land, nor does it provide any standards by which to do so. The Department cites Chenequa to support its contention that § 23.15 does not provide the Friends a legally protectable interest in the land exchange. In Chenequa, the court of appeals concluded petitioners lacked standing under a similarly-worded statute——Wis. Stat. § 84.09(5)——to challenge a land sale authorized by the Department of Transportation (DOT) and approved by the governor. Chenequa, 275 Wis. 2d 533, ¶¶25-26, 30. We agree that Chenequa is on point.

¶37 The statute at issue in Chenequa, Wis. Stat. § 84.09(5), outlined certain procedural requirements the DOT must follow in the sale of land, including presenting to the governor "a full and complete report of the property to be sold, the reason for the sale, and the minimum price for which the same should be sold, together with an application for the governor's approval of the sale." Id., ¶4 n.2 (quoting § 84.09(5)). In order to sell the land, the DOT must have

30

determined "that the property is no longer necessary for the state's use for highway purposes[.]" Id. (quoting § 84.09(5)). This language mirrors the text of Wis. Stat. § 23.15(1) and (2), authorizing the Board to sell state land when it "determines that the lands are no longer necessary for the state's use for conservation purposes" and requiring the Board to "present to the governor a full and complete report of the lands to be sold[.]" See § 23.15(1), (2).

¶38 The court of appeals concluded in Chenequa that Wis. Stat. § 84.09(5) imposes "no substantive requirements governing the sale . . . on either DOT or the governor, other than DOT's obligation to determine that the property is no longer necessary for highway purposes[.]" Chenequa, 275 Wis. 2d 533, ¶25. Regarding the statute's lack of substantive or procedural criteria, the court explained:

> Other than the determination under the first point [that the property is no longer necessary for the state's use for highway purposes], there are no substantive criteria for determining what property to sell. There are also no substantive criteria for determining whether to sell at a public or private sale or for determining to whom to make the sale. The only procedures established in the statute for the sale . . . relate to the process between DOT and the governor . . . .
>
> There is nothing in Wis. Stat. § 84.09(5) that indicates this section was intended to establish procedures to protect persons or entities interested in purchasing state property. The "full and complete report" is plainly for the governor's benefit, not the benefit of potential purchasers.

31

Id., ¶¶21-22. The court elaborated, "[t]here is nothing in § 84.09(5) that suggests it is intended to ensure the public gets the highest price for the property, or that the sales be carried out in particular ways to benefit the public." Id., ¶25. Consequently, the court determined "neither the [petitioner's] interest as a potential purchaser of property for sale under Wis. Stat. § 84.09(5) nor the general public's interest in such sales are arguably within the zone of interests the statute is intended to protect." Id., ¶26.

¶39 Although the court of appeals in Chenequa referenced what the statute "intended," that decision was released less than one month after this court declared in Kalal "[i]t is the law that governs, not the intent of the lawgiver." State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶52, 271 Wis. 2d 633, 681 N.W.2d 110 (quoting Antonin Scalia, A Matter of Interpretation, at 17 (Princeton University Press, 1997)). In describing the pre-Kalal approach to ascertaining statutory meaning, this court explained "[t]he typical statutory interpretation case will declare that the purpose of statutory interpretation is to discern and give effect to the intent of the legislature, but will proceed to recite principles of interpretation that are more readily associated with a determination of statutory meaning rather than legislative intent[.]" Id., ¶43. This description fits the court of appeals' opinion in Chenequa to a tee. Chenequa's focus on the absence of textually-imposed procedures designed to protect interested persons or textually-imposed "substantive

32

requirements" on the agency or the governor reflected an effort to ascertain statutory meaning, rather than an endeavor to divine the legislature's "intent." Notwithstanding Chenequa's use of the "zone of interests" terminology, we affirm the soundness of the statutory interpretation applied in Chenequa.[20]

¶40 Like the parallel land-sale statute in Chenequa, Wis. Stat. § 23.15 provides no substantive criteria governing the sale other than the Department's obligation to determine the lands are no longer necessary for the state's use for conservation purposes. See § 23.15(1). Similar to Wis. Stat. § 84.09(5), nothing in § 23.15 "establish[es] procedures to protect persons or entities interested in" challenging land-sale decisions. See Chenequa, 275 Wis. 2d 533, ¶22. Additionally, the statute's gubernatorial-approval provision does not confer upon or contemplate the authority of private citizens to veto the governor's land-sale decisions via Wis. Stat. ch. 227. See § 23.15(2). Because the interests the Friends assert are not protected, recognized, or regulated under § 23.15, that statute cannot serve as a basis for conferring standing on the Friends under Chapter 227.

---

[20] In Chenequa, the court of appeals addressed standing in the context of a declaratory judgment action, determining the "zone of interests" requirement in administrative agency challenges was "essentially equivalent" to the "logical nexus" requirement in declaratory judgment actions. See Chenequa Land Conservancy, Inc. v. Village of Hartland, 2004 WI App 144, ¶¶14–16, 275 Wis. 2d 533, 685 N.W.2d 573. We confine our review of the "zone of interests" terminology to the context of petitions filed under Wis. Stat. ch. 227.

33

## 2. Wisconsin Admin. Code §§ NR 1.47 & 44.04

¶41 In addition to the aforementioned statutes, the Friends cite "various provisions of Wis. Admin. Code chs. NR 1 and 44, including §§ NR 1.47 and 44.04" as a basis for their claims. For purposes of determining a petitioner's standing to challenge agency decisions, we apply the same analysis to the Wisconsin Administrative Code as we apply to statutes. The rules the Friends cite, dealing with procedures for selling land and the master plan process, do not protect, recognize or regulate any interests of the petitioners sufficient for standing under Wis. Stat. §§ 227.52 and 227.53.

¶42 Wisconsin Admin. Code § NR 1.47, addressing the disposition of state park lands, provides that "[s]tate-owned lands within state park boundaries shall not be sold or otherwise disposed of." Wis. Admin. Code § NR 1.47(1). "State-owned lands outside state park boundaries and not within any other department project which serve no project purpose may be sold when the natural resources board determines such lands are no longer necessary for the state's use for conservation purposes and then shall be disposed of only in accordance with the following priorities: (a) Sale to or exchange with a local unit of government when required for a public use[,] (b) Exchange with others to consolidate state ownership within a park boundary[, and] (c) Sale to others." § NR 1.47(2). Finally, "[r]estrictions may be imposed on lands disposed of to insure aesthetic park settings or compatible adjacent land uses." § NR 1.47(3).

34

¶43 None of these procedural regulations contain any "substantive criteria" by which petitioners could challenge the Board's determination that "such lands are no longer necessary for the state's use for conservation purposes" or the Department's sale or exchange of land, whether within or beyond state park boundaries, or the discretionary selection of restrictions "to insure" either "aesthetic park settings or compatible adjacent land uses." Nothing in the text of these regulations indicates they establish procedures designed to protect individuals or entities who may be interested in the lands. In the absence of such standards or procedures, these regulations do not protect, recognize, or regulate the interests of private parties who may wish to challenge agency action under them.

¶44 The Friends' argument regarding Wis. Admin. Code § NR 44.04 as a source for its claims is not well-developed. As well as we can discern, the Friends argue § NR 44.04(7) requires "[t]he public" to "be provided opportunities to participate throughout the planning process for a property," but the Friends do not allege denial of an opportunity to participate. In their Amended Petition, the Friends allege the Department in 2017 "initiated a master planning process under Wis. Admin. Code ch. NR 44 to consider Kohler Co.'s request to use state park land for the golf course" and that the Friends "testified and provided comments" at the Board's meeting in February 2018 regarding the land exchange, which the Board approved "before the master planning process was complete." Nowhere in the

Amended Petition do the Friends assert they were denied "opportunities to participate throughout the planning process."

¶45 The Friends additionally cite § NR 44.04(9), under which "only those management and development activities identified in the master plan may be pursued by the department." Nowhere in the Amended Petition, however, do the Friends assert the master plan did not include a transaction with Kohler involving state land; to the contrary, the Amended Petition specifically says: "In 2017, the DNR initiated a master planning process under Wis. Admin Code ch. NR 44 to consider Kohler Co.'s request to use state park land for the golf course."  Although in their brief the Friends later suggest the removal of land from the Park and its conveyance to Kohler required "being approved in the master plan under Wis. Admin. Code § NR 44.04(9)," nothing in that regulation imposes such a requirement.  Neither of these code provisions serve as a basis for the Friends' challenge to the Board's decision to exchange land with Kohler.[21]

---

[21] The dissent points to a number of WEPA cases in support of the Friends' alleged procedural violations.  Dissent, ¶84 n.21 (citing Applegate-Bader Farm, 396 Wis. 2d 69; Milwaukee Brewers, 130 Wis. 2d 56; WED I, 69 Wis. 2d 1).  Although the dissent asserts the Friends raise the kind of procedural violation which "routinely bestow[s] standing on any member of the public directly injured by a procedurally flawed agency action," the Friends did not in fact raise such a violation under WEPA.  Id., ¶84.

IV.  CONCLUSION

¶46  In clarifying that the "zone of interests" expression of standing has no basis in Wisconsin law, we retain our well-established standing inquiry for challenges to administrative decisions.  In order for Wis. Stat. ch. 227 petitioners to satisfy the second standing element, they must identify a statute which protects, recognizes or regulates an interest the petitioners allege has been "adversely affected."  Wis. Stat. §§ 227.01(9), 227.52, 227.53(1).  Absent from this purely statutory analysis is any subjective judicial assessment of whether the asserted interest falls within a "zone of interests" under an identified statute.

¶47  The Friends' Amended Petition identifies statutes and regulations they assert protect or regulate interests they allege have been injured.  None of the statutes the Friends cite, however, protects, recognizes or regulates their asserted interests.  Accordingly, the Friends lack standing to challenge the Board's decision to approve the exchange of land between the Department and Kohler.

*By the Court.*—The decision of the court of appeals is reversed.

37

¶48 BRIAN HAGEDORN, J. *(concurring)*. The majority correctly concludes that the petitioners in this case do not have a right to judicial review of the land transfer decision. I join the opinion. In refocusing the zone-of-interests analysis on whether an agency decision "adversely affect[s] the substantial interests of any person," the court rightly turns the analytical framework closer to the statutory text it implements. See Wis. Stat. § 227.52. I write separately to highlight a potential issue implicit in the majority's discussion.

¶49 In 1976, the legislature amended Wis. Stat. ch. 227, replacing "legal rights, duties or privileges" with "substantial interests." § 19, ch. 414, Laws of 1975. As the majority observes, our cases have largely applied an identical analytical framework both before and after the 1976 amendment. We have not addressed whether the 1976 amendment modified the right to judicial review of administrative decisions. A careful focus on the text of our laws, rather than incorporating federal caselaw, may require an alteration to this approach. While the parties do not raise or develop these issues, today's decision is a good step toward aligning the inquiry with the statute, as we should. Therefore, I join the majority opinion and respectfully concur.

1

¶50 JILL J. KAROFSKY, J. *(dissenting)*. The law plainly grants the Friends standing to seek judicial review of the Department of Natural Resource's (DNR) actions that the Friends allege were unlawful and harmful to its members. Yet a majority of this court prefers to slam shut the courthouse doors and reworks the law to reach its desired result. The majority reworks the law by distorting case law, conflating standing with the merits, and failing to engage in any meaningful interpretation of the legislative text. In the end, the majority reinvents the limits on judicial review in a manner not otherwise found in the legislatively enacted text. Because I would apply the law as the legislature wrote it——which guarantees harmed parties like the Friends their day in court——I respectfully dissent.

I

¶51 This case implicates statutes and regulations related to DNR's management of state parks and DNR-owned lands. These laws exist entirely for the sake of the public's interest in conserving, enjoying, and using Wisconsin's cherished natural resources. These laws were precipitated by concerns that our state had done too little to protect this paramount interest. Having witnessed other states squander opportunities to protect their natural resources from "commercial vandalism" and exclusive "private ownership," in 1907 Wisconsin Governor James Davidson, at the direction of the legislature, convened the state park board. See John Nolen, State Parks for Wisconsin 7-8 (1909); § 1, ch. 495, Law of 1907. That board eventually endorsed the recommendation of renowned landscape architect John

1

Nolen to establish state parks open to the public's use and enjoyment. As Nolen stated:

> The issue appears plain. Is Wisconsin going to look upon its bay and lake shores, its rivers and bluffs, its dells, its inland lakes, its forests, as natural resources to be conserved and some portion at least acquired and held for the benefit of all the people——both for present and future generations?

Nolen, supra, at 38 (emphasis added). Wisconsin answered by adopting a state park system for the benefit of all Wisconsinites——a system protected in part by the laws DNR allegedly violated.

¶52 Members of the public need not sit idly by when a state agency may have transgressed the very laws designed to protect their interests. Rather, the legislature has guaranteed that any person "whose substantial interests are adversely affected" by an agency decision may call upon the judiciary to be a check on executive decision-making. Wis. Stat. §§ 227.01(9) & 227.53(1); see State ex rel. First Nat. Bank of Wis. Rapids v. M & I Peoples Bank of Coloma, 82 Wis. 2d 529, 544 n.10, 263 N.W.2d 196 (1978) ("[J]udicial review of the action of an administrative agency is one of the checks and balances to achieve a proper balance between government regulation and the protection of personal and property interests from arbitrary action."). This right to judicial review is broad; our precedent recognizes only two narrow limits on it. First, the challenged action must "adversely affect[]" the person, that is, it must "directly cause[]" the person's injury. Waste Mgmt. of Wis., Inc. v. DNR, 144 Wis. 2d 499, 505, 424 N.W.2d 685 (1988) (quoting Wis.'s Env't Decade, Inc. v. PSC, 69 Wis. 2d 1, 10, 230

2

N.W.2d 243 (1975) (WED I)). Second, the person's injured interest must be "recognized by law," meaning it must be one "which the law recognizes or seeks to regulate or protect." Id.

¶53 Applying this decades-old framework, the Friends brought a routine environmental injury case. The Friends claim that DNR's grant of an easement through the Kohler-Andrae State Park and DNR's removal and subsequent transfer of lands from the Park injured its members' aesthetic, conservational, and recreational interests. Moreover, the Friends contend DNR's injurious actions were procedurally and substantively unlawful. Procedurally, the Friends complain that DNR's actions contravened the Park's master plan because the agency failed to revise that plan as required by Wis. Admin. Code ch. NR 44. Substantively, the Friends allege that the agency transferred the removed Park lands to private ownership without a lawful finding that the "lands are no longer necessary for the state's use for conservation purposes," as required by Wis. Stat. § 23.15(1) and Wis. Admin. Code § NR 1.47(2).

¶54 Existing law entitles the Friends to judicial review of these claims. Yet the majority opinion inexplicably and of its own accord rewrites the law to restrict the right to judicial review beyond that which the legislative text grants. The majority does this in two regards. First, it purports to realign the "zone of interests" limitation on Wis. Stat. ch. 227 standing with the relevant text. But upon closer inspection, all the majority has done is rename the test "substantial interests" to mimic the statutory language without any regard for what the words "substantial interests" actually mean. This

3

entire relabeling exercise turns out to be a distraction from the majority's second, more serious rewrite of the law.  Subtly, the majority opinion injects its own additional "substantive criteria" limitation into law, which finds no home in the legislative text.  Compounding its errors, the majority then misapplies its newly minted limit on ch. 227 review, sowing more confusion into ch. 227 standing.  Collectively, the majority opinion's errors provide a prime example of how "textualism" can be manipulated to conceal a result-oriented legal analysis.

A.  The Atextual "Zone of Interests" Test

¶55 Let's start with a point of agreement.  This court's determination that a person's injured interest must fall within the relevant law's "zone of interests" is disconnected from the legislative text.  We first adopted the "zone of interests" limitation in 1975, styling it after the United States Supreme Court's contemporaneous interpretation of the federal Administrative Procedure Act.  See WED I, 69 Wis. 2d at 10 (citing Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970) & Barlow v. Collins, 397 U.S. 159 (1970)).  But even in 1975, the two statutes being interpreted meaningfully differed:

- The state statute read: "any person aggrieved by a[n agency] decision . . . and directly affected thereby shall be entitled to judicial review thereof," Wis. Stat. § 227.16 (1973-74);

- The federal statute read: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant

4

statute, is entitled to judicial review thereof," 5 U.S.C. § 702 (emphasis added).

¶56 From the latter's underlined text, it is evident why the United States Supreme Court limited federal judicial review to only those injuries "arguably within the zone of interests to be protected or regulated by the [relevant] statute." Ass'n of Data Processing, 397 U.S. at 153. Wisconsin Stat. § 227.16 contained no similar language which would justify this court's imposition of an identical limitation. To this day, Wisconsin statutory law omits its federal counterpart's "within the meaning of a relevant statute" language, stating instead that any "person or agency whose substantial interests are adversely affected by a determination of an agency" "shall be entitled to judicial review of the decision."[1] The only change in Wisconsin law since our 1975 decision relevant here is that the statute now includes the words "substantial interests."

¶57 In short, I agree that the "zone of interests" limitation lacks a textual basis in the otherwise broad cause of action the Wisconsin legislature affords those affected by agency decisions; in the appropriate case, perhaps this court should revisit it. Here, though, no party asks us to do so, making this case an inappropriate vehicle for such an overhaul.

---

[1] This simplified formulation combines Wis. Stat. § 227.53 ("any person aggrieved by a decision specified in [§] 227.52 shall be entitled to judicial review of the decision") and Wis. Stat. § 227.01(9)'s definition of a "person aggrieved" ("a person or agency whose substantial interests are adversely affected by a determination of an agency"). See also Wis. Stat. § 227.52 ("Administrative decisions which adversely affect the substantial interests of any person, whether by action or inaction, whether affirmative or negative in form, are subject to review . . . .").

5

Deciding this issue, when no one asked us to do so, both deprives our deliberations of analysis refined in the fires of adversarial litigation and unfairly surprises the parties. See, e.g., City of Janesville v. CC Midwest, Inc., 2007 WI 93, ¶68, 302 Wis. 2d 599, 734 N.W.2d 428 (Ann Walsh Bradley, J., concurring). Still, the majority heedlessly marches forward.

¶58 Though the majority opinion pays homage to a "textually-driven analysis,"[2] its analysis is anything but based in the text. Removing the atextual "zone of interests" limitation on Wis. Stat. ch. 227 standing should make judicial review easier to obtain. But the majority manages to do the opposite by: (1) merely applying the same restrictive "zone of interests" test under a label only superficially matching the text; and (2) using the nominally textual critique of "zone of interests" as cover for the introduction of a new, more restrictive, and still atextual, "substantive criteria" limitation.

B. Same Test, New Name

¶59 The majority opinion declares a textualist victory over the "zone of interests" test. In reality, all it has done is relabel the existing test to create the illusion that it is consistent with the legislative text. The majority claims it has eradicated the subjectivity supposedly present in WED I's articulation of the "zone of interests" test. But the truth is

---

[2] See, e.g., majority op., ¶28; id., ¶25 (complaining "the 'zone of interests' terminology is untethered to the text"); id., ¶26 (proclaiming that "the 'zone of interests' language" is not "grounded . . . in the statutory text"); id., ¶39 (criticizing a "pre-Kalal approach" to statutory interpretation).

that as early as the 1980s this court has articulated the "zone of interests" test exactly the same way the majority opinion now asserts: a "statutory question" on whether the "nature of the statute" "recognizes or seeks to regulate or protect" the plaintiff's injured interest. See Waste Mgmt., 144 Wis. 2d at 503-508. The only change the majority opinion makes is renaming the test "substantial interests" rather than "zone of interests."[3]

¶60 Simply renaming the test "substantial interests," however, fails to actually interpret what the words "substantial interests" mean. Is "substantial interests" a legal term of art? Or is this test the result of those two words' common, ordinary, and accepted meaning? The majority does not say. Yes, the majority opinion recites some statutory history, but its conclusory musing that those changes somehow do not "endorse[]" the "zone of interests" label while simultaneously not "abrogating" its substance is far from a true text-based analysis.[4] See majority op., ¶27. In sum, the majority opinion

---

[3] See, e.g., majority op., ¶¶12 & 30 (calling "zone of interests" a "misnomer"); id., ¶25 (claiming to change only "the 'zone of interests' terminology" (emphasis added)); id., ¶¶2 & 28 (concluding that the "'zone of interests' nomenclature" has "no basis in the text" (emphasis added)); id., ¶46 (purporting to clarify only "that the "zone of interests" expression of standing has no basis in Wisconsin law" (emphasis added)).

[4] Citation to three cases decided after the 1975 amendment that never even mention "substantial interests"——except in footnotes merely quoting the full statutory text——does not cure the dearth of a "textually-driven analysis." Those cases expressly rely on WED I's pre-amendment interpretations without reservation or even acknowledging the statutory changes.

maintains a judicial limitation on Wis. Stat. ch. 227 standing that remains unaddressed in light of the legislature's "substantial interest" language.

## C. A Distraction from the New "Substantive Criteria" Limit

¶61 The majority opinion's hollow label change only obscures the subtle insertion of another, more exacting atextual limitation——and the majority's prompt misapplication of that limitation. According to the majority, standing to invoke judicial review now turns on whether the law underlying the claim both: (1) protects, recognizes, or regulates the petitioner's injured interest; and (2) contains "substantive criteria." The problem with the new "substantive criteria" limitation is threefold. First, it is based on a single court of appeals decision that neither cites any authority for this limitation nor supports how the majority opinion applies it here. Second, the search for "substantive criteria" conflates standing with a prejudgment on the merits. And finally, demanding "substantive criteria" forsakes the actual legislative text. Such a condition overrides the substantive criteria and procedures that Wis. Stat. ch. 227 already provides, thus

---

A real analysis of "substantial interests" might mean that neither the "zone of interests" label nor its substance survive. The test (under whichever label) requires interpreting the law allegedly violated. That makes sense under the federal "within the meaning of a relevant statute" language; it makes little sense in a statute lacking similar language. Perhaps Wisconsin's legislature crafted a broader judicial review provision to ensure a more robust judicial check on state agencies than the federal Congress deemed necessary. Whatever the answer is, the majority opinion's label change simply puts spoiled milk into a new carton, which fails to address the problem.

8

overruling the legislature's policy decision to grant broad standing to challenge agency decisions.

### 1. Chenequa

¶62 The majority opinion draws its "substantive criteria" limitation from Chenequa Land Conservancy, Inc. v. Village of Hartland, 2004 WI App 144, 275 Wis. 2d 533, 685 N.W.2d 573. The majority's reliance on Chenequa is puzzling, however. For one, the Chenequa court created the "substantive criteria" limitation out of whole cloth as it cites no case or statute for this limit. See id., ¶¶21 & 25. More confounding, though, the majority misapplies Chenequa's "substantive criteria" limit to reach a result contrary to the one Chenequa compels.

¶63 To explain, Chenequa involved a prospective buyer, the Chenequa Land Conservancy, Inc. ("Chenequa"), displeased that the Department of Transportation (DOT) sold DOT-owned lands to a competing bidder. Chenequa's challenge invoked Wis. Stat. § 84.09(5), a statute containing a similar provision to one in Wis. Stat. § 23.15(1) at issue in this case. Section 84.09(5) authorizes DOT to sell department-owned property when it "determines that the property is no longer necessary for the state's use for transportation purposes." That language parallels the "no longer necessary for the state's use for conservation purposes" language in § 23.15(1). See also Wis. Admin. Code § NR 1.47(2).

¶64 As a prospective buyer, Chenequa was not challenging the determination that the land was no longer necessary for the state's use; it needed the land sale to happen in order to purchase it. Rather, Chenequa's challenge centered on how DOT

9

selected the winning bidder——a matter unrelated to whether the land remained "necessary for the state's use for transportation purposes." But § 84.09(5) was silent as to the substantive criteria by which DOT should select the winning bid. As such, the court of appeals concluded that because "there are no substantive requirements governing the sale . . . <u>other than DOT's obligation to determine that the property is no longer necessary for highway purposes</u>," Chenequa lacked standing to seek judicial review of the bidding process. <u>Chenequa</u>, 275 Wis. 2d 533, ¶25 (emphasis added). By using "other than," the <u>Chenequa</u> court held that the statute's only substantive criterion was the determination about the lands' necessity for a specified purpose.[5] But because that determination was the only substantive criterion and Chenequa's bid-selection challenge did not implicate it, Chenequa lacked standing.

¶65 From this holding, the majority opinion engages in a glaring non sequitur. Like the <u>Chenequa</u> court, the majority recognizes that "§ 23.15 provides no substantive criteria governing the sale <u>other than</u> [DNR]'s obligation to determine the lands are no longer necessary for the state's use for conservation purposes." Majority op., ¶40 (emphasis added). But then, without explanation or analysis, the majority concludes that despite the Friends' challenge directly invoking the substantive criterion in § 23.15, the Friends' conservational interests "are not protected, recognized, or

---

[5] <u>Other than</u>, Collins Dictionary, https://www.collinsdictionary.com/us/dictionary/english/other-than ("You use other than after a negative statement to say that the person, item, or thing that follows is the only exception to the statement.").

regulated under § 23.15, [and] that statute cannot serve as a basis for conferring standing on the Friends." Id. That simply does not follow.

¶66 Under the most generous read, the majority opinion is falsely equating the Friends' interests with those of Chenequa. But the two petitioners raised different challenges. Chenequa did not challenge DOT's determination that the land was no longer necessary for state purposes (because they wanted the sale to occur, just under different terms). The Friends, by contrast, do not want the transfer to occur and directly challenge DNR's determination that the affected lands are no longer necessary for conservational purposes. Therefore, applying Chenequa's "substantive criteria" holding actually leads to the opposite conclusion than the one the majority reaches.

2. Prejudging the merits at the standing stage

¶67 A threshold standing determination decides only whether a petitioner is entitled to be heard by the court; "standing in no way depends on the merits of the p[etitioner]'s contention that particular conduct is illegal." Warth v. Seldin, 422 U.S. 490, 500 (1975). Indeed, as we explained in Moustakis v. DOJ, "[s]tanding and statutory interpretation are distinct and should not be conflated." 2016 WI 42, ¶3 n.2, 368 Wis. 2d 677, 880 N.W.2d 142. Yet the majority's new "substantive criteria" limitation appears to do just that——it conflates the Friends' standing with a prejudgment on the laws allegedly violated. Thus, not only is the majority's new "substantive criteria" limit on judicial review unsupported by

11

any precedent, it also runs counter to our case law by conflating standing with statutory interpretation.

### 3. No basis in the text

¶68 More fundamentally, this "substantive criteria" limitation betrays the legislative text. No provision in Wis. Stat. ch. 227 directs courts to seek out substantive criteria in the statute or regulation at issue. In fact, such a directive conflicts with portions of ch. 227 that already provide the substantive lens for judicial review and the applicable procedures.

¶69 Under Wis. Stat. § 227.57, a reviewing court substantively evaluates the agency decision for:

- "a material error in procedure or a failure to follow prescribed procedure" that impaired "the fairness of the proceedings or the correctness of the action";

- an erroneous interpretation of applicable law;

- "any finding of fact" on which the agency action depends "that is not supported by substantial evidence in the record" or was "determined without a hearing"; or

- an exercise of discretion "outside the range of discretion delegated to the agency by law," "inconsistent with an agency rule, an officially stated agency policy or a prior agency practice, if deviation therefrom is not explained to the satisfaction of the court by the agency," "or is otherwise in violation of a constitutional or statutory provision."

Critically, these provisions provide the only substantive criteria by which a court may review an agency's decision. See

12

§ 227.57 (limiting the scope of judicial review to these criteria).[6]  Chapter 227 likewise establishes comprehensive procedures for judicial review of agency decisions. See §§ 227.40-227.60.

¶70 Despite ch. 227's existing substantive and procedural judicial-review provisions, the majority opinion denies the Friends standing in part because "nothing in § 23.15 'establish[es] procedures to protect persons or entities interested in' challenging land sale decisions."  Majority op., ¶40 (alteration in original) (quoting Chenequa, 275 Wis. 2d 533, ¶22).  But never has this court held, and certainly no statute directs, that the only reviewable agency decisions are those that implicate substantive laws containing their own judicial-review criteria and procedures.  Such a rule forsakes the plain text of ch. 227.  That rule is also nonsensical:  Why would the right to judicial review depend on substantive statutes containing their own judicial-review criteria and procedures when those criteria and procedures already appear in a statutory chapter entirely dedicated to judicial review?  The majority opinion's newly crafted "substantive criteria" limitation is nothing short of the enactment of judicial policy at odds with legislative policy enshrined in the statutory text.

---

[6] The Friends' challenge fits well within these criteria. For example, a court could adjudicate whether redrawing the Park's boundaries without amending the Park's master plan was "inconsistent with" or "otherwise in violation of" Wis. Admin. Code ch. NR 44.  So, too, could a court answer whether the factual finding that the disposed lands were "no longer necessary for the state's use for conservation purposes" lacked "support[] [from] substantial evidence in the record."

D. The Textualism Smokescreen

¶71 Though the majority opinion seeks to style itself as a "textually-driven analysis," the above shows it actually gives little regard to the text. This dissonance supplies a prime example of how the textualism descriptor and the objectivity it allegedly imparts can be used to conceal or distract from an otherwise result-orientated analysis.

¶72 Broadly speaking, textualism is an approach to interpreting laws that focuses almost exclusively on the "plain meaning" of the statutory text. See generally State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶¶38-52, 271 Wis. 2d 633, 681 N.W.2d 110. That emphasis on the text generally disregards the enacting body's intent and the law's underlying purpose, to the extent either is not "ascertainable from the text and structure." Id., ¶¶48-51. The purported virtue of this approach is that it constrains judicial discretion by curbing any tendency to let policy preferences color legal interpretations under the guise of legislative "intent" or "purpose."[7] Just read and apply the law as written. Simple, right?

¶73 Unfortunately, that's not always the case. Empirics and experience tell us that a textualist approach is as susceptible to a result-driven analysis as any of its alternatives. That is because textualism invites the very

---

[7] See Antonin Scalia, A Matter of Interpretation 17-18, 22, 40-41 (Amy Gutmann ed., 1997); Antonin Scalia & Bryan A. Garner, Reading Law at xxviii (2012); see also John F. Manning, Justice Scalia and the Idea of Judicial Restraint, 115 Mich. L. Rev. 747 (2017).

14

judicial discretion it claims to oust; it simply shifts that discretion to between the lines.  Which version of textualism is appropriate?[8]  Which words deserve attention?[9]  When do those words shift from "plain" to "ambiguous"?[10]  Which canons of legal

---

[8] Multiple ideological "camps" of textualism have emerged that emphasize either formalism or flexibility.  See Tara Leigh Grove, Which Textualism?, 134 Harv. L. Rev. 265, 279-90 (2020).  The divergent textualist opinions in Bostock v. Clayton County, 590 U.S. ___, 140 S. Ct. 1731 (2020), exposed the wide discretion a textualist Justice exercises in identifying the relevant "context"——semantic, social, or otherwise——in which she interprets the text.  See Grove, supra, at 279-90.

[9] Not only do the United States Supreme Court's recent cases reveal that courts have a wide "choice of context," they also face a "choice of text" dilemma that can be outcome determinative.  See William N. Eskridge, Jr. & Victoria F. Nourse, Textual Gerrymandering, 96 N.Y.U. L. Rev. 1718, 1738-88 (2021).  "[T]he number of 5-4 splits in cases involving textual method deployed by both sides," which regularly turn on the Justices' differing "choice of text," indicate that no singular "plain meaning" actually exist.  See Victoria Nourse, Textualism 3.0, 70 Ala. L. Rev. 667, 669-84 (2019).

[10] "Language is often ambiguous; the distinction between 'plain' and 'ambiguous' is in the eye of the beholder; and both words too often are conclusory labels a court pins on a statute, making its decision appear result-oriented."  State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶63, 271 Wis. 2d 633, 681 N.W.2d 110 (Abrahamson, C.J., concurring) (footnotes omitted); see also State v. Byers, 2003 WI 86, ¶¶45-56, 263 Wis. 2d 113, 665 N.W.2d 729 (Abrahamson, C.J., concurring).

15

interpretation apply?[11]   Which canons carry the day when two
different sets of canons compel separate outcomes?[12]   What
happens when a single canon cuts in both directions?[13]   Judicial
discretion abounds, yet rarely does the rationale for how a
court exercises any of that discretion find its way on to the

---

[11] The choice of canons is vast, with as much as 187
different options from which to cherry pick.  See William N.
Eskridge, Jr., The New Textualism and Normative Canons, 113
Colum. L. Rev. 531, 536 (2013) (reviewing Scalia & Garner, supra
note 6).  Moreover, not every Justice on this court agrees on
which interpretive canons are actually "canon," which can lead
to diverging results.  See, e.g., United Am., LLC v. DOT, 2021
WI 44, ¶15 & n.9, 397 Wis. 2d 42, 959 N.W.2d 317.  Nor is there
agreement on when these canons should apply in any given case.
See State v. Peters, 2003 WI 88, ¶14, 263 Wis. 2d 475, 665
N.W.2d 171; see also James v. Heinrich, 2021 WI 58, ¶¶76-83, 397
Wis. 2d 517, 960 N.W.2d 350 (Dallet, J., dissenting).

[12] "[T]here is no canon for ranking or choosing between
canons; the code lacks a key."  Richard A. Posner, The Federal
Courts: Crisis and Reform 277 (1985).  More vexingly, some of
the most common canons directly spar against one another.  See
Karl N. Llewellyn, Remarks on the Theory of Appellate Decision
and the Rules or Canons About How Statutes Are to Be
Construed, 3 Vand. L. Rev. 395, 401-06 (1950); see also Anita S.
Krishnakumar, Dueling Canons, 65 Duke L.J. 909 (2016).

[13] Case in point, the recent James v. Heinrch decision cited
the canon against surplusage as supporting the majority's end
result, despite the fact that the same canon cut in the opposite
direction.  See James, 397 Wis. 2d 517, ¶81 (Dallet, J.,
dissenting).   The majority opinion never explained why it
nevertheless applied this canon only for its conclusion.

written page. Far from unfailing objectivity,[14] the textualist label can be "a rhetorical smokescreen" obscuring a result-oriented analysis.[15]

¶74 The metaphor of a smokescreen precisely captures the majority opinion. The majority attempts to pass its analysis off as impartially applying the text. But in reality the majority reaches a result unsupported by that text. Here the majority perpetuates the "zone of interests" limitation on ch. 227 standing by changing only its label. While this label change from "zone of interests" to "substantial interests" superficially aligns the same "zone of interests" test with the statutory text, the majority's analysis fails to actually address this test's substantive inconsistency with the text. Indeed, that whole exercise of arbitrarily grafting the same

---

[14] The textualist's various canons are often disconnected from legislative realities, meaning a textualist analysis "actively shape[s]" legal texts rather than "passively reflect[s]" the enacting body's plain meaning. See Abbe R. Gluck & Lisa Schultz Bressman, Statutory Interpretation from the Inside-An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I, 65 Stan. L. Rev. 901, 961-64 (2013). Indeed, many of the canons require the court to indulge substantive presumptions that reflect value preferences, regardless of whether the enacting body shares those presumptions or preferences. See Abbe R. Gluck, Justice Scalia's Unfinished Business in Statutory Interpretation, 92 Notre Dame L. Rev. 2053, 2071-72 (2017).

[15] Neil H. Buchanan & Michael C. Dorf, A Tale of Two Formalisms, 106 Cornell L. Rev. 591, 640 (2021); see also William N. Eskridge, Jr. & Philip P. Frickey, Foreword: Law As Equilibrium, 108 Harv. L. Rev. 26, 77-78 (1994). Indeed, textualism can, at times, function as "indirect purposive analysis [that] enables just as much judicial discretion as the purposivist interpretive tools that textualists decry——but under the guise of neutral, objective linguistic or canon-based analyses." Anita S. Krishnakumar, Backdoor Purposivism, 69 Duke L.J. 1275, 1280 (2020).

test onto different text only distracts from the majority's subtle adoption of an additional, judicially crafted "substantive criteria" limitation that lacks any textual basis.

¶75 Further exposing the majority's disregard for legislative text and this court's interpretive principles is the majority's application of the enhanced limitations on Wis. Stat. ch. 227 standing. The majority opinion ignores critical context by interpreting each substantive law underlying the Friends' petition in isolation. See majority op., ¶¶32-45. This divide-and-conquer approach to legal interpretation is wholly foreign to our interpretive principles. See Kalal, 271 Wis. 2d 633, ¶¶46, 48-49 (explaining that "statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole"; "a plain-meaning interpretation cannot contravene a textually or contextually manifest statutory purpose").

¶76 Of course, none of this is to say that the text of statutes or regulations is inherently unreliable; every court must read the law's words to interpret the law's meaning. But here, the majority is not engaging in an objective, text-driven analysis. Rather, the majority opinion's invocation of textualist principles attempts to hide an otherwise result-driven opinion aimed at keeping the Friends out of the courtroom.

II

¶77 Turning next to the proper analysis in this case, I conclude the Friends have standing to challenge DNR's actions. Current law asks only two questions: (1) did the challenged actions "directly cause[]" the Friends' injuries; and (2) are

18

those injured interests ones that the challenged law recognizes, protects, or regulates?[16]  See, e.g., Waste Mgmt., 144 Wis. 2d at 505.  The answer to both inquiries is a straightforward "yes."

## A. Injury

¶78 The Friends claim that DNR granted an easement through the Park, removed Park lands, and conveyed those lands to private ownership contrary to law.  It contends these unlawful acts injured its members' interests in:

- continuing to enjoy and recreate in the removed portion of the Park——including camping, hiking, snowshoeing, and biking——as they have in the past;

- observing and studying plants, birds, and animals whose habitats will become inaccessible or reduced due to the transfer of public land to private ownership;

- the conservational value of the affected Park lands in preserving "the Black River, its wetlands, the forest, and the adjoining Lake Michigan as an ecological whole"; and

- the aesthetics of the area adjacent to the affected Park lands.[17]

---

[16] Though I question the continued validity of the second limitation in light of the yet-to-be interpreted "substantial interests" language, this issue has not been properly presented to the court and so I continue to apply the law as it currently stands. See supra, ¶¶6-8.

[17] Because I ultimately deem these alleged injuries sufficient to establish standing, I do not address the Friends' other alleged injuries arising from a proposed golf course project near the Park and their nearby homes.  The link between DNR's actions here and the golf course's construction raise a more complex analysis than necessary to resolve this case. See generally Wis.'s Env't Decade, Inc. v. PSC, 69 Wis. 2d 1, 14, 230 N.W.2d 243 (1975) (WED I).

Perhaps trifling to some, these alleged injuries to the members' "aesthetic, conservational and recreational interests ha[ve] been readily accepted as sufficient to confer standing." WED I, 69 Wis. 2d at 10; see also City of Mayville v. DOA, 2021 WI 57, ¶18, 397 Wis. 2d 496, 960 N.W.2d 416 (instructing that "standing should be liberally construed" such that "even a trifling interest may be sufficient to confer standing" (citations omitted)). Indeed, the persuasive federal authority on this point uniformly holds that so long as the allegations include regular interaction with the affected lands and concrete intentions to interact with them in the future,[18] as opposed to a solitary prior use or "some day" intentions,[19] then the environmental harm constitutes a direct injury. See, e.g., Waste Mgmt., 144 Wis. 2d at 509 (identifying the federal administrative standing doctrine as "particularly persuasive").

¶79 The Friends' allegations raise concrete injuries to its members' ongoing aesthetic, conservational, and recreational interests in the affected Park lands. Accordingly, and

---

[18] See, e.g., Summers v. Earth Island Inst., 555 U.S. 488, 494 (2009); Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 181-82 (2000); Sierra Club v. EPA, 939 F.3d 649, 664 (5th Cir. 2019); Sierra Club v. U.S. Dep't of the Interior, 899 F.3d 260, 283 (4th Cir. 2018); Nat'l Wildlife Fed'n v. Espy, 45 F.3d 1337, 1340-41 (9th Cir. 1995); Save Our Cmty. v. EPA, 971 F.2d 1155, 1160-61 (5th Cir. 1992); United States v. Metro. St. Louis Sewer Dist., 883 F.2d 54, 56 (8th Cir. 1989).

[19] See, e.g., Lujan v. Defs. of Wildlife, 504 U.S. 555, 563-64 (1992); Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 889 (1990).

consistent with long-settled precedent, the Friends allege sufficiently direct injuries to confer standing.

B. Protected, Recognized, or Regulated Interests

¶80 The question then becomes whether the Friends' injured interests are "protected, recognized, or regulated" by the "nature of" the laws supposedly violated. Id. at 508. To make that determination, we employ our usual interpretative principles. See Foley-Ciccantelli v. Bishop's Grove Condo. Ass'n, Inc., 2011 WI 36, ¶¶43-44, 333 Wis. 2d 402, 797 N.W.2d 789; see also Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 127 (2014). Here, the Friends contend its members' interests are protected, recognized, or regulated by two categories of laws: (1) the substantive protections in Wis. Stat. § 23.15(1) and Wis. Admin. Code § NR 1.47(2); and (2) the procedural protections in Wis. Admin. Code ch. NR 44. I address each in turn.

1. Substantive protections

¶81 "State-owned lands within state park boundaries shall not be sold or otherwise disposed of." Wis. Admin Code § NR 1.47(1). Needing to circumvent this restriction so it could transfer 4.59 acres of Park lands to private ownership, DNR cleverly redrew the Park's boundaries to remove those 4.59 acres. With the lands now outside state park boundaries, DNR faced only one additional hurdle—a determination that the removed lands were "no longer necessary for the state's use for conservation purposes." See Wis. Stat. § 23.15(1); Wis. Admin. Code § NR 1.47(2). DNR made that determination, but the Friends dispute whether DNR did so lawfully.

21

¶82 The required determination that the lands are unnecessary "for conservation purposes" repeated in § 23.15(1) and § NR 1.47(2) plainly protects, recognizes, and regulates the conservational interests of any member of the public. Though these laws reference the "state's use," the mention simply recognizes that the state is the steward of the public's interests in state park lands. That is especially clear when viewed in context. The closely related Wis. Stat. § 27.01(1) declares it to be the legislative policy that such lands be conserved "to provide areas for public recreation and for public education in conservation and nature study" (emphases added). See Kalal, 271 Wis. 2d 633, ¶49 (emphasizing the importance of "closely-related statutes" such as "explicit statements of legislative purpose"). The next subsection, § 27.01(2), then empowers DNR to carry out that legislative policy as the steward of park lands. This all comports with the precipitating history, culminating in John Nolen's declaration that these invaluable lands should be conserved "for the benefit of all the people——both for present and future generations."[20] Nolen, supra, at 38.

¶83 Therefore, § 23.15(1) and § NR 1.47(2)'s conditioning the disposition of DNR-owned lands on a finding that the lands are no longer necessary for conservation purposes——read in the

---

[20] Though the class of persons whom a law protects, recognizes, or regulates can be large——as is the case here——that does not mean anyone in that class may sue whenever the relevant agency acts. The first prong still limits the judicial-review right to those class members adversely affected (directly injured) by the agency action. See Wis. Stat. § 227.01(9); Waste Mgmt. of Wis., Inc. v. DNR, 144 Wis. 2d 499, 505, 424 N.W.2d 685 (1988).

22

proper context of DNR's role as the public's steward over public lands——makes clear that this required finding protects, recognizes, and regulates the public's interest in conserving those lands for their recreational, educational, and aesthetic value. Cf. Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209 (2012) (concluding that a statute authorizing discretionary land acquisition did, in context, nonetheless regulate the acquired land's use, such that "neighbors to the use . . . are reasonable——indeed, predictable——challengers" to the land's acquisition given how the new use would affect their "economic, environmental, or aesthetic" interests). Accordingly, § 23.15(1) and § NR 1.47(2)'s concern for the Friends' aesthetic, conservational, and recreational interests confer standing to raise its substantive challenge.

### 2. Procedural rights

¶84 "Procedural rights are special." Lujan v. Defs. of Wildlife, 504 U.S. 555, 572 n.7 (1992) (cleaned up). Because process matters, alleged procedural violations routinely bestow standing on any member of the public directly injured by a procedurally flawed agency action. We see this most often with claimed violations of the procedural Wisconsin Environmental Policy Act (WEPA).[21] Though no WEPA claim is raised here, the Friends do allege a qualifying procedural violation of the

---

[21] See, e.g., Applegate-Bader Farm, LLC v. DOR, 2021 WI 26, 396 Wis. 2d 69, 955 N.W.2d 793; Milwaukee Brewers Baseball Club v. DHSS, 130 Wis. 2d 56, 387 N.W.2d 245 (1986); WED I, 69 Wis. 2d 1. In fact, a procedural violation confers standing even when an agency might ultimately reach the same decision after satisfying the missed procedural step. See Massachusetts v. E.P.A., 549 U.S. 497, 517-18 (2007).

23

analogous procedures required by Chapter NR 44 of the Wisconsin Administrative Code.

¶85 Chapter NR 44 creates a process for the uniform management of park lands following a land classification system. See §§ NR 44.01, NR 44.05-44.07. "A master plan establishes the authorized management and development on a property, and only those management and development activities identified in the master plan may be pursued by [DNR]." § NR 44.04(9) (emphases added). The master plan must include, among other things, a "general property description"; a "statement of general goals and objectives for management and use, and a description of how the property's statutory and other purposes and benefits will be realized"; and "management, acquisition, development and use plans, with appropriate maps showing the land management classifications." § NR 44.04(9)(a). This regulatory chapter also provides a process for revising a park's master plan. The revision process demands that the affected public be given opportunities to participate, see §§ NR 44.04(1)(a) & 44.04(7)(f), and requires careful study of the issues similar to (if not exactly) the environmental analysis required under WEPA, see § NR 44.04(8) (cross-referencing Wis. Stat. § 1.11 (WEPA)).[22]

¶86 Kohler sought to acquire Park land adjacent to its own property to construct a golf course. Because a golf course was

---

[22] Even when a full WEPA-style impact analysis is not needed, Wis. Admin. Code § NR 44.04(8)(c)3. still requires that a plan revision or amendment involve "[a] regional analysis addressing the economic, ecological and social conditions, opportunities and constraints associated with the property on a local and regional scale."

apparently inconsistent with the Park's master plan, DNR initiated a process to alter it; DNR never finished that plan revision. Therefore, following its removal and transfer of Park lands to Kohler, the master plan contained an inaccurate "general property description" and land management classifications inconsistent with the Park's new geographic footprint. DNR also failed to study the environmental impact this change would have on the Park. The Friends maintain all of this is unlawful. See § NR 44.04(9) ("[O]nly those management and development activities identified in the master plan may be pursued by [DNR]" (emphases added)); § NR 44.04(8)(c)3.

¶87 While a plan's substance internally guides DNR's management of park lands, the regulatory text makes clear that the process to adopt or alter the plan exists to protect the affected public. The affected public explicitly includes "persons or groups who are affected by a master plan or project" and "persons with an interest in [DNR] management practices across a specific area or statewide." § NR 44.04(1)(a). Park neighbors and users like the Friends' members are such affected persons. The law protects these affected parties by ensuring "public involvement"——a phrase repeated no less than 18 times throughout ch. NR 44——in the process, which may take a variety of forms. With few exceptions not applicable here, effectuating public involvement in any master plan process is mandatory. § NR 44.04(7)(f).

¶88 The Friends' petition raises serious procedural questions regarding the lawfulness of DNR's redrawing of Park boundaries contrary to the master plan's property description or

25

without sufficient environmental study. Our job here is not to decide those procedural questions. Instead, we face a very narrow question: do these procedures protect, recognize, or regulate the interests of the Park's neighbors and users? The answer is clearly yes. The Friends' members are the "[a]ffected or interested parties" for whom the law's mandatory public involvement processes are meant to protect. As such, the Friends have standing to pursue this procedural challenge as well.

### III

¶89 The majority opinion goes to great lengths to slam shut the courthouse doors on those who seek judicial review of agency decisions. In creating additional barriers to judicial review, the majority twists the statutory text and bends our case law. And what's the toll of this court substituting its policy judgment for that of the legislature? Taken to its logical conclusion, the majority's new approach to Wis. Stat. ch. 227 standing grants DNR the unfettered right to redraw all state park boundaries. In redrawing the boundaries, DNR will be able to remove, and then sell off, every last inch of this cherished land to private entities, and not a single Wisconsin citizen——for whom the parks exist——could challenge that conduct in court. Not only is that result absurd, it betrays the broad cause of action the legislature endowed on citizens to challenge such lawless agency behavior in court. We have upheld that right for many just like the Friends, and we should uphold that right here. Because four Justices rule otherwise, I respectfully dissent.

¶90  I  am  authorized  to  state  that  Justices  ANN  WALSH BRADLEY and REBECCA FRANK DALLET join this dissent.